OF THE

## STATE OF NEW JERSEY,

## ON APPEAL FROM THE COURT OF CHANCERY

AND PREROGATIVE COURT.

MARCH TERM, 1884.

———————

JENNIE M. FLAGG and husband, appellants,

*v.*

ABRAM F. BALDWIN, respondent.

1. Contracts for speculations in stocks upon margins, when the broker and the customer do not contemplate or intend that the stock purchased or sold shall become or be treated as the stock of the customer, but the real transaction is a mere dealing in the differences between prices—that is, in the payment of future profits or losses, as the event may be, are contracts of wager, dependent on a chance or casualty. Such contracts, if made in this state, are unlawful, and securities given therefor are void by force of the provisions of "the act to prevent gaming." *Rev. p. 458.*

2. Such contracts, though made in another state, where they are to be presumed to be lawful and enforceable, will not be enforced here—at least against residents and citizens of this state—because their enforcement would violate the plain public policy of this state on the subject of gambling and betting evinced by the statute above mentioned. In this respect, such contracts are

219

excepted from the rule of comity which requires the enforcement by the courts of one state of contracts made in another, if valid by the *lex loci contractus*.

On appeal from a decree of the chancellor, whose opinion is reported in *Baldwin* v. *Flagg, 9 Stew. Eq. 48.*

*Mr. A. Q. Keasbey,* for appellants.

*Mr. Cortlandt Parker,* for respondent.

The opinion of the court was delivered by

MAGIE, J.

The bill in this case was filed for the foreclosure of a mortgage made by Jennie M. Flagg and William L. Flagg, her husband, (who are the appellants) to Abram F. Baldwin (who is the respondent), upon lands in this state, to secure the payment of appellants' bond. The bond and mortgage were dated August 26th, 1880. The bond was in the ordinary form of a money obligation and was conditioned for the payment to respondent of $11,563.44, with interest, on demand. The mortgage recited that it was intended to secure the money which appellants had so bound themselves to pay, and that the amount of $11,563.44 was made up of $7,563.44, which was therein declared to be then due from appellants to respondent, and of $4,000 to be security for future advances.

From the proofs it appears that the sum of $7,563.44, so admitted to be due from appellants to respondent, was made up of different sums. One sum represented the loss which had been incurred by Mr. Flagg in a stock speculation which had been carried on by him and one Ripley with respondent, a stockbroker in New York. Another sum represented losses incurred by Mr. Flagg in a like speculation carried on by him and respondent in joint account. Another sum represented losses incurred in a like speculation originally carried on by Mr. Flagg with respondent and afterwards transferred to and carried on by Mrs. Flagg (under the control and management of her husband)

Flagg v. Baldwin.

with respondent. The losses thus incurred were the result of stock dealings for these respective parties upon a margin sometimes put up in cash, and in Mrs. Flagg's case in her own note, which represented her margin.

The $4,000 of future advances were designed and intended as a margin for a continuance of the stock speculation of Mrs. Flagg to be carried on in her name under the management of her husband with respondent, and the advances contemplated by both parties were such as would cover and make good her losses therein, if any.

Respondent's books show that the bond and mortgage were credited to Mrs Flagg's account for the sum of $11,563.44, and that account had been charged with the previous losses. It appears further that the speculative stocks carried in that account have all been closed out with the result of leaving a balance in Mrs. Flagg's favor of $653.93. Since the mortgage entered into the account, the effect is that there is due thereon the sum of $10,909.51, with interest, and its foreclosure and the sale of the mortgaged premises must be conceded unless some of the defences are sustained.

The main defence goes to the validity of the bond and mortgage, and contests them on the ground that the contracts out of which they arose were wagering contracts and illegal and void, and that the bond and mortgage securing an indebtedness arising solely from such cause are tainted with the same illegality and cannot be enforced.

In coming to the consideration of the question thus raised, it is obvious that it is important to determine at what place the contracts contested were made. For if they are New Jersey contracts and subject to our law, the sole question is whether they are such contracts as are declared unlawful by the "act to prevent gaming." *Rev. p. 458.* While if they are contracts of another place, it must be preliminarily determined whether they are objectionable by the law of the place of contract; or if not, whether they will still be enforced by our courts.

The evidence seems to leave no room for doubt that the contracts in question are contracts made and to be performed in the

state of New York. The transactions anterior to the execution of the bond and mortgage took place wholly within that state. By the bond and mortgage the parties averred they resided in that state. The mortgagee did, in fact, reside there. The mortgage was acknowledged there. Delivery of the papers was made, and the remaining transactions took place there. Although the mortgage affected lands in this state, the above-stated facts establish, according to a long line of decisions, that the contracts were New York contracts. *Cotheal* v. *Blydenburgh, 1 Hal. Ch. 17; S. C., 1 Hal. Ch. 631; De Wolf* v. *Johnson, 10 Wheat. 367; Dolman* v. *Cook, 1 McCart. 56; Campion* v. *Kille, 1 McCart. 229; S. C., 2 McCart. 476; Atwater* v. *Walker, 1 C. E. Gr. 42.*

Where contracts of a particular kind are forbidden by the law of the state in which they are sought to be enforced, and the party seeking to enforce them relies on the fact that they were made in a foreign state and are valid contracts by the *lex loci contractus*, it has been held elsewhere that he is bound to aver and prove those facts. *Thatcher* v. *Morris, 11 N. Y. 437.*

But the rule which seems to have been established in this state requires one who defends against a foreign contract, if he relies on its being invalid by force of the *lex loci contractus*, to both set up and prove the foreign law. *Campion* v. *Kille, ubi supra; Dolman* v. *Cook, ubi supra; Uhler* v. *Semple, 5 C. E. Gr. 288.*.

We have, then, to deal with transactions which took place within the state of New York and must be presumed to be governed by the laws of that state. Whatever may be the rule respecting the burden of setting up and proving the law of the foreign state under such circumstances, neither appellants nor respondent have furnished in their pleadings or proofs any information on the subject. In the absence of proof of the law of another state, the better opinion is that, at least with respect to states comprised in the territory severed from England by the revolution, the presumption is that the common law prevails. *White* v. *Knapp, 47 Barb. 549; Stokes* v. *Macken, 62 Barb. 145; Holmes* v. *Broughton, 10 Wend. 75; Thurston* v. *Percival, 1 Pick. 415; Shepherd* v. *Nabors, 6 Ala. 631; Walker* v.

Flagg v. Baldwin.

*Walker, 41 Ala. 353 ; Thompson v. Monrow, 2 Cal. 99 ; Inge v. Murphy, 10 Ala. 885 ; Norris v. Harris, 15 Cal. 226 ; Titus v. Scantling, 4 Blackf. 89 ; Crouch v. Hall, 15 Ill. 263 ; Brown v. Pratt, 3 Jones (N. C.) Eq. 202.*

By the common law, contracts of wager and similar contracts were not objectionable *per se.* They were, in fact, enforced by the courts without any objection on the score of being dependent on a chance or casualty. Courts did, in some instances, refuse to enforce such contracts, but only when the subject of the wager was objectionable, as tending to encourage acts contrary to sound morals (*Gilbert v. Sykes, 16 East 150*); or being injurious to the feelings or interests of third persons (*De Costa v. Jones, Cowp. 729*); or against public policy or public duty (*Atherfold v. Beard, 2 T. R. 610 ; Tappenden v. Randall, 2 B. & P. 467 ; Shirley v. Sankey, 2 B. & P. 130 ; Hartley v. Rice, 10 East 22*).

It has not been urged, nor does there seem to be ground for contending, that the transactions in question were such as by the common law would not be enforced.

We are therefore required to determine whether these contracts, made in the state of New York, and presumed to be governed, as to their validity, by the doctrines of the common law and not objectionable thereunder, are to be enforced in this state.

The common law under which such contracts were enforceable has been here altered by the passage of the act against gaming above referred to. By the first section, all wagers, bets or stakes made to depend on any lot, chance, casualty or unknown or contingent event are declared to be unlawful. By the third section, all bonds, mortgages or other securities made or given, where the whole or any part of the consideration shall be for money laid or betted in violation of the first section, or for repaying money knowingly advanced to help or facilitate such violation, are declared to be utterly void.

If the contracts now sought to be enforced would be obnoxious to these provisions of our statute, if made in this state, are we to enforce them because made in New York, where we are bound to presume the common law exists unaltered ?

The enforcement of a foreign law and contracts dependent

Flagg v. Baldwin.

thereon for validity, within another jurisdiction and by the courts of another nation, is not to be demanded as a matter of strict right. It is permitted, if at all, only from the comity which exists between states and nations. Every independent community must judge for itself how far this comity ought to extend. Certain principles are well-nigh universally recognized as governing this subject. It is everywhere admitted that a contract respecting matter *malum in se,* or a contract *contra bonos mores,* will not be enforced elsewhere, however enforceable by the *lex loci contractus.* An almost complete agreement exists upon the proposition that a contract valid where made will not be enforced by the courts of another country, if, in doing so, they must violate the plain public policy of the country whose jurisdiction is invoked to enforce it, or if its enforcement would be injurious to the interest or conflict with the operation of the public laws of that counrty *Story's Confl. Laws* § *244; 1 Addison Cont.* § *241; Forbes* v. *Cochrane, 2 B. & C. 448; Grell* v. *Levy, 16 C. B. (N. S.) 73; Hope* v. *Hope, 8 De G., M. & G. 731; 2 Kent's Com. 475; Bank of Augusta* v. *Earle, 13 Pet. 519; Ogden* v. *Saunders, 12 Wheat. 213; Blanchard* v. *Russell, 13 Mass. 1:* This proposition has been announced and applied in our own state. *Varnum* v. *Camp, 1 Gr. 326; Frazier* v. *Fredericks, 4 Zab. 162; Moore* v. *Bonnell, 2 Vr. 90; Bentley* v. *Whittemore, 4 C. E. Gr. 462; Watson* v. *Murray, 8 C. E. Gr. 257; Union L. & E. Co.* v. *Erie R. Co., 8 Vr. 23.*

Since the courts of each state must, at least in the absence of positive law, determine how far comity requires the enforcement of foreign contracts, it results that there is contrariety of view, and the proposition above stated is not universally admitted. Thus, in New York, a contract made in Kentucky, under a law of that state, establishing a lottery for the benefit of a college, was upheld, notwithstanding the law of New York prohibiting lotteries. *Com. of Ky.* v. *Bassford, 6 Hill 526.* Chief-Justice Nelson limited the cases of contracts not enforceable, though valid where made, to such as are plainly contrary to morality. He gave no consideration to the doctrine elsewhere settled, that excludes from enforcement, contracts opposed to the public policy

or violative of a public law of the place of enforcement. In this view, he seems to be sustained by the court of appeals. *Thatcher* v. *Morris, 11 N. Y. 437.*

So, in Massachusetts, a contract arising out of a completed sale of lottery tickets, in a state where such sale was lawful, was enforced by the courts, although such sale was there prohibited by statute. *McIntyre* v. *Parks, 3 Metc. 207.* But there was no discussion of principles by the court.

The courts of this state have expressed and enforced different views. Thus, in *Varnum* v. *Camp, 1 Gr. 326,* the question of the validity of a foreign assignment for the benefit of creditors, came before the supreme court. The assignment was made in New York, and was assumed to be valid by the law of that state. It created preferences, and by the law of this state, was fraudulent and void. The assignment was held unenforceable here. Chief-Justice Ewing, whose opinion was adopted by the court, puts the decision distinctly upon the ground that the assignment was one in violation of the policy of our laws, in hostility with their provisions, and which they declared to be fraudulent and void. In *Bentley* v. *Whittemore, 4 C. E. Gr. 462,* a similar question arose in this court, and the doctrine of *Varnum* v. *Camp* was restated and affirmed. The application of the doctrine was, however, limited to the protection of the residents and citizens of this state, for whose benefit its public policy was held to be adopted. With respect to non-residents, or citizens of other states, it was held that comity would require the recognition of foreign assignments, if valid where made. *Watson* v. *Murray, ubi sup.,* was the case of a bill filed for an account of a partnership transaction in a lottery in another state, where such a transaction was claimed to be lawful. The bill was dismissed on the advice of Vice-Chancellor Dodd. His conclusion was that such a transaction, though valid where made, should not be enforced here, because it was in violation of a public law of this state, and within the exceptions to the rule of comity requiring the enforcement of foreign contracts. He further argued that lotteries are not only illegal, but are to be judicially considered to be immoral. It is unnecessary to determine how far that

view can be sustained. But with the conclusion arrived at I unhesitatingly agree. It is in accord with the decisions in *Varnum* v. *Camp* and *Bentley* v. *Whittemore*. It seems to me that no court can, on full consideration, deliberately adopt a rule that will require the enforcement of foreign contracts, violative of the public laws and subversive of the distinct public policy of the country whose laws and policy they are bound to enforce. No *comitas inter communitates* can compel such a sacrifice.

The limitations on the rule laid down in *Bentley* v. *Whittemore* do not come in question in this case. It appears that Mrs. Flagg was, in fact, a resident of this state at the time these contracts were made, and there is nothing to show a change of residence.

We are brought, then, to the question whether our law against gaming is such a public law and establishes such a public policy as to require us to refuse to enforce foreign contracts in conflict with it, in a case like that under consideration. I think this question must be answered in the affirmative.

It is true that, in *Dolman* v. *Cook* and *Campion* v. *Kille, ubi sup.*, foreign contracts, valid by the law of the state where made, were enforced here, although, by our law, they were usurious and declared to be void. No consideration seems to have been given to the question whether our usury law was such a law and evinced such a public policy as required us to refrain from enforcing foreign contracts in conflict with it. As we have seen, that consideration led our courts to reject foreign assignments violative of our laws, where the interests of our own citizens were concerned. But a plain distinction at once presents itself between a usury law and a law regulating assignments for the benefit of creditors, or a law against gaming. One affects only the parties to the contract, and is framed for the protection of the borrower. The others relate to the public or classes of the public who are interested therein and affected thereby.

But our law against gaming goes further than to merely prohibit the vice or avoid contracts tainted with it. It declares it unlawful, and so puts the contracts beyond the protection of the laws or the right of appeal to the courts. The reason and object of the law are obvious. The vice aimed at is not only injurious

Flagg *v.* Baldwin.

to the person who games, but wastes his property, to the injury of those dependent on him, or who are to succeed to him. It has its more public aspect, for if it be announced that a trustee has been false to his trust, or a public officer has embezzled public funds, by common consent the first inquiry is whether the defaulter has been wasting his property in gambling.

In my judgment, our law against gaming is of such a character, and is designed for the prevention of a vice, producing injury so widespread in its effect, the policy evinced thereby is of such public interest that comity does not require us to here enforce a contract which, by that law, is stigmatized as unlawful, and so prohibited.

It remains to determine whether the enforcement of these contracts will conflict with the provisions of this statute and the public policy thereby established. If so, it must be for the reason that the mortgage secures an indebtedness arising out of transactions that are wagers.

In considering this question, care should be taken not to trench upon legitimate and proper enterprises. The act is not intended to interfere with the right of buying and selling for speculation.

The line is to be drawn between what is legitimate speculation and what is unlawful wager. When property is actually bought, whether with money or with credit, the purchaser and owner may lawfully hold it for a future rise and risk a future fall. With such transactions, the law does not pretend to interfere. They are within the line of lawful speculation.

But when, either without any disguise or under a guise which simulates such legitimate enterprises, the real transaction is a mere dealing in the differences between prices, *i. e.*, in the payments of future profits or future losses, as the event may be, then, in my judgment, the line which separates lawful speculation from illegal wagering is crossed, and the contract, under our law, becomes unlawful, and the securities for it void.

This proposition is sustained by all the cases, without an exception, that I can discover. The only disagreement relates to the application of the doctrine.

Thus, in New York, the court of appeals, in *Kingsbury* v.

*Kirwan*, *77 N. Y. 612*, declared that a contract for the purchase and sale of property would be a wagering contract, if it was the understanding that the property should not be delivered, but that only the difference in the market price should be paid and received. In *Bigelow* v. *Benedict*, *70 N. Y. 202*, the same view had been expressed, and it was also held that, although the form of the contract was unobjectionable, yet if, in fact, it was a mere cover for betting on the future price of a commodity, and no actual sale or purchase was intended, the contract was one of wager.

It is true that the same court has determined, though against the protest of able and distinguished judges, that between the broker purchasing on a margin and his customer, the relation of principal and agent and of pledgor and pledgee, exists. *Markham* v. *Jaudon*, *41 N. Y. 235*; *Baker* v. *Drake*, *66 N. Y. 518*; *Gruman* v. *Smith*, *81 N. Y. 25*. It has been there held that a broker can recover from his customer deficiencies arising from sales of stocks bought on a margin, and that where, upon a margin, a broker made "short sales" of stock, which he borrowed for that purpose, he might recover of his customer what was expended in replacing the borrowed stock. *Wicks* v. *Hatch*, *62 N. Y. 535*; *Knowlton* v. *Fitch*, *52 N. Y. 288*. But in these cases, it does not seem to have been contended that the contract was a mere cover for wager. Such contention was made in *Kingbury* v. *Kirwan* and *Bigelow* v. *Benedict*, but it was held that there was no sufficient evidence that the transactions were not real. Upon a review of all the cases in New York, they establish, in my judgment, the correct doctrine that a contract relating to differences only would be a wager contract. But they also hold that dealings on margin are not to be considered as dealings in mere differences. If, in any case, evidence sufficient to show that the margin dealings were mere covers for dealings in differences was produced, then, upon the principles there laid down, the contracts would be wagers.

In the courts of Pennsylvania, the same principles have been often enunciated. Thus, in *Smith* v. *Bouvier*, *70 Pa. St. 325*, the court approved a charge to a jury which left to them to say

whether the transactions embraced in the case were *bona fide* or were mere covers for gambling operations. See, also, *Fareira* v. *Gabell, 89 Pa. St. 89.* And in general, whenever the verdict of a jury established, or the evidence required the court to hold, that the transactions, however correct in point of form, were mere dealings in differences, they were declared to be wagers. *Brua's Appeal, 55 Pa. St. 294; Kirkpatrick* v. *Bonsall, 72 Pa. St. 155; Maxton* v. *Gheen, 75 Pa. St. 166; North* v. *Phillips, 89 Pa. St. 250; Dickson* v. *Thomas, 97 Pa. St. 278; Ruchizky* v. *De Haven, 97 Pa. St. 202; Patterson's Appeal, 16 Rep. 59.* The point of divergence between the New York and Pennsylvania cases is upon the relation existing between the customer and the broker who is managing a speculative account upon a margin. The New York cases treat the broker as a mere agent, and so as a pledgee of the stocks purchased on such an account. This result was reached by a divided court, Justices Grover and Woodruff delivering vigorous dissenting opinions. The latter especially points out, in a perspicuous and, in my judgment, convincing way, the plain difference between a stock broker dealing on margins and a broker or agent in ordinary transactions. *Markham* v. *Jaudon, 41 N. Y. 256.* In Pennsylvania, it is held that one who enters into a stock speculation on margins, with a stock broker, is to be considered as dealing with the broker as a principal, and not as an agent. *Ruchizky* v. *De Haven, supra.* This view is, in my judgment, entirely correct. The customer who deals on margins knows no other person in the transaction but the broker. He has no claim upon, and is subject to no liability to any other person whatever.

The same doctrine has been announced by the supreme court of the District of Columbia (*Justh* v. *Holliday, 11 Wash. L. Rep. 418*), and by the United States circuit court in the district of Kansas. *Cobb* v. *Prell, 22 Am. Law Reg. (N. S.) 609.* To the latter case a note is appended, discussing the subject and collecting many cases.

In *Grizewood* v. *Blane, 11 C. B. 526,* it was held that a colorable contract for the sale and purchase of railway shares, when neither party intends to deliver or accept the shares, but merely

to pay differences according to the rise and fall of the market, was a gaming contract, within the *8 and 9 Vict. c. 109 § 18*, which declares contracts by way of gaming and wagering void, and forbids recovery of any money won on a wager. The subsequent case of *Thacker* v. *Hardy, L. R. (4 Q. B. Div.) 685*, does not shake the authority of *Grizewood* v. *Blane*, but expressly approves it. Since, however, in the case of *Thacker* v. *Hardy*, a broker was permitted to recover of his customer indemnity for contracts entered into on a speculative account, although the broker knew the customer did not intend to accept the stock bought or deliver the stock sold for him, but expected the broker to so arrange matters that nothing but differences were to be payable by him, it has been much relied on by respondent's counsel. But, in that case, the broker was treated as a mere agent entering into contracts for his principal, and so entitled to indemnity against any personal liability thereon. The ground of decision was that the contract, as between the customer and the other principal (the stock broker being treated as mere agent), was, at the most, void, but not illegal, and that the broker's right of indemnity was not affected thereby. Thus, Lindsley, J., by whom the case was tried without a jury, says that: "If gaming and wagering were illegal, I should be of opinion that the illegality of the transactions in which the plaintiff and defendant were engaged, would have tainted, as between them, whatever plaintiff had done in furtherance of their illegal designs, and would have precluded him from claiming, in a court of law, any indemnity from the defendant in respect of liabilities incurred." He points out that it had been held, under the English act of *8 and 9 Vict.*, above cited, that, although gaming and wagering contracts could not be enforced, they were not illegal. He draws the conclusion that the acts of the broker, not being in furtherance of an illegal transaction, and being directed by the customer, entitled him to indemnity against loss thereby. On appeal, the views of the trial judge were approved.

It will be observed that our statute declares such contracts not only void, but unlawful, and, further, that the relation of agency between the customer and broker, in such transactions on which

the decision was grounded, is not, by the weight of authority in this country, recognized as the real relation of the parties. For reasons above given, I think it clear that the customer and broker, in these margin transactions, deal as two principals, and not as principal and agent.

My conclusion is that these transactions, so far as affected by our law against gaming, are to be examined, to discover their real nature, and if, however unobjectionable their form may be, the real contract is merely in respect to differences, the contract is a wager, both void and unlawful.

On examining the transactions in question in this cause, with a view to discover their real character, I am compelled to the conclusion that, however they may have been made to imitate real transactions, they were in fact mere wagers. It never was contemplated, intended or agreed, by either party, that the stocks purchased or sold were to become or to be treated as the stocks of appellants. The real contract disclosed by the evidence was to receive and to pay differences.

All the transactions were upon margins. They commenced by Flagg's depositing $1,000 with respondent, when he agreed to open the account, which was wholly a speculative account. Afterwards Flagg deposited $300 more. Then the wife's note for $4,500 was put in, and the account transferred to her name. Finally the bond and mortgage were given.

Upon these advances the purchases were very large. Respondent testifies that upon the margin of $1,300, stocks of a cash value of about $450,000 were purchased for the account between January 28th and June 16th, 1880. After the account was transferred to Mrs. Flagg's name, stocks to an amount between $600,000 and $700,000, were purchased between June 16th, 1880 and March 17th, 1881. Thus, in less than fourteen months, purchases aggregating over $1,000,000 were made. According to Flagg's statement, the account once held one thousand three hundred shares, of a par value of $1,300,000.

The certificates of the stocks were never transferred or delivered to appellants.

These enormous transactions were far beyond the ability of

appellants at any time, and were known to be so.    It appears
that respondent was notified that the first advance was all that
Flagg had to speculate with.    The wife's note, and subsequently
her bond and mortgage, were resorted to with the avowed pur-
pose of binding her separate property.    Respondent admits that
he was informed and knew that Flagg was speculating for all
that Mrs. Flagg and he had in the world.

Under such circumstances, it is idle to pretend that there was
or could be any hope or expectation that appellants were to take
or could be required to take these vast amounts of stock.    For
respondent to have tendered them, and demanded payment for
them, would have been absurd in the extreme.    The whole cir-
cumstances show that no such right to tender entered into the
transaction.    On the contrary, the contract plainly was that if
the stocks bought advanced, the profit was to be realized by a
sale.    If they declined, the remedy of respondent to save himself
was by a sale.    The settlement was to be of the profits and losses
thus ascertained.

If, in the absence of express stipulation, the reciprocal rights
of tendering and demanding this stock would be presumed to
enter into such a contract, the whole circumstances corroborate
the testimony of Flagg, who swears that it was expressly under-
stood that there was not to be any actual delivery of stocks, and
that he should not be required to pay for them.

In the able opinion below, much stress is laid on the fact that
the purchases and sales for this account were actually made by
respondent.    He so testifies, and produces vouchers in corrobo-
ration of his statement.    That the transactions were very large,
and upon a petty advance, is not sufficient, probably, to permit
us to reject this positive statement.    But assuming it to be true
that respondent actually purchased or sold every share of stock
in this account, I am unable to perceive how the circumstance
affects the conclusion in this case.    If respondent was the mere
agent of the appellants in transactions with third parties, there
might be some significance attached to it.    But such is not, as
we have seen, the real nature of the relation between the parties.
They were dealing, as to this transaction, as principals, and it was

Flagg *v.* Baldwin.

a matter of indifference whether respondent owned or bought the stock he agreed to carry. The transaction was precisely like that which Judge Woodruff, in the dissenting opinion in *Markham* v. *Jaudon*, characterized as " an executory agreement for a ·pure speculation in the rise and fall of stock, which the broker, on condition of indemnity against loss, agrees to carry through in his own name and on his own means or credit, accounting to him [the customer] for the profits, if any, and holding him responsible for the losses." Such an agreement is, within the principles above referred to, a wager.

Nor is the result altered by the fact that the broker has or attempts to retain perfect indemnity against loss on his part. As I interpret the transactions, respondent, in consideration of commissions and interest on advances, agreed to buy and hold stock in anticipation of a rise; or to sell stock of his own, or borrowed for that purpose, in anticipation of a fall. The agreement required him to pay the profits of the transaction, which would otherwise be his, to appellants. On the other hand, appellants, in consideration of his thus carrying the stock bought, or providing the stock sold, agreed that in case of a rise or fall to a certain amount, the stock should be closed out, and the loss, which otherwise would fall on respondent, should be paid by them to him. This bargain contained all the elements of a wager. It is not less a wager because one of the parties obtained a guaranty for the performance of the bargain by the other party.

For these reasons my conclusion is that the transactions in question were wagers within the meaning of our law; that the securities given for them would be absolutely void if the contracts were made in this state; that although made in a foreign state, and not objectionable by the law which must be presumed (in the absence of proof) to govern them, they will not be, and ought not to be, enforced in this state, between these parties, because to enforce them would be opposed to a public policy on this subject of the vice of gaming, perspicuously shown by our law on that subject.

·The decree below must be reversed, and a decree entered dismissing the bill. Appellants are entitled to their costs.

For reversal—THE CHIEF-JUSTICE, DIXON, KNAPP, MAGIE, SCUDDER, VAN SYCKEL, COLE—7.

For affirmance—DEPUE, PARKER, REED, CLEMENT, WHITAKER—5.