200 N.J. Super. 584 (1985)
491 A.2d 1317
THE MORTGAGE BANKERS ASSOCIATION OF NEW JERSEY, APPELLANT,
v.
THE NEW JERSEY REAL ESTATE COMMISSION, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued February 5, 1985.
Decided April 26, 1985.
*588 Before Judges PRESSLER, BRODY and COHEN.
E. Robert Levy argued the cause for appellant (Levy & Lybeck, attorneys; E. Robert Levy, of counsel and on the brief; Clark E. Alpert, on the brief).
Sarah T. Darrow, Deputy Attorney General, argued the cause for respondent (Irwin I. Kimmelman, Attorney General of New Jersey, attorney; James J. Ciancia, Assistant Attorney General, of counsel; Sarah T. Darrow, on the brief).
Henry A. Hart argued the cause pro hac vice for intervenor-respondent The First Boston Capital Group, Inc. (Robinson, Wayne, Levin, Riccio & La Sala, attorneys; Henry A. Hart and Ronald L. Lord, of counsel and on the brief; John B. Livelli, on the brief).
Albert J. Peasco, Jr. argued the cause for intervenors ERA Mortgage, Inc. and Electronic Realty Associates, Inc. (Weiner *589 & Hendler, attorneys; Robert B. Hendler and Albert J. Peasco, Jr., on the brief).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
This appeal raises important questions respecting a real estate broker's involvement in the mortgage financing which a prospective buyer requires in order to purchase residential property from the broker's primary principal, the seller. More particularly, the substantive issue is whether the broker, who will be receiving a commission from the seller for negotiating the sale, is prohibited by N.J.S.A. 45:15-17(i) from also earning a consideration for assisting the buyer in obtaining the necessary financing.
The issue comes to us by way of an appeal by the Mortgage Bankers Association (MBA) of a declaratory ruling by the New Jersey Real Estate Commission which concluded that the cited statutory provision does not bar the broker's double compensation for services rendered in respect of both the sale and the financing. We reverse the ruling. First we conclude that it is contrary to the mandate of N.J.S.A. 45:15-17(i). Even if it were not, we are satisfied that its nature, scope and public import are of a magnitude which would have required the Commission to have acted by an exercise of its rule-making power. We also express considerable concern about the efficacy of the Commission's unilateral action in view of the overlapping jurisdiction of the Commissioner of Banking.
Explanation of the questions raised by this appeal requires reference to the factual, procedural and legislative circumstances culminating in the Commissioner's ruling. MBA is a trade association whose members are mortgage bankers and mortgage brokers licensed pursuant to N.J.S.A. 17:11B-1, et seq. The general business of a mortgage banker is to grant loans secured by a mortgage and then to sell the obligation at a discount. Since the sale is typically to an out-of-state capital *590 source, the mortgage banker is effectively importing capital into the state. See N.J.S.A. 17:11B-1(c). And see New York Times, March 27, 1985, at D1, D8. The mortgage banker makes his profit by charging the borrower discount points as the consideration for granting the loan. A point is one percent of the loan. He also charges the borrower a variety of additional fees for processing and consummating the loan. See N.J.S.A. 17:11B-13(b). The business of the mortgage broker is to bring together, for a consideration, the primary borrower and a mortgage lender. N.J.S.A. 17:11B-1(d).
Prior to the enactment in 1981 of N.J.S.A. 17:11B-1 et seq. (Mortgage Bankers Act), which places the mortgage, banking and brokerage business under the administrative jurisdiction and regulatory control of the Commissioner of Banking, mortgage bankers and brokers were subject only to the control of the Real Estate Commission pursuant to N.J.S.A. 45:15-1 et seq. See, e.g., George H. Weinrott & Co. v. Burlington Housing Corp., 22 N.J. Super. 91 (Ch.Div. 1952). Consequently, mortgage bankers and brokers held only a real estate broker's license, were ordinarily also engaged in the real estate brokerage business either directly or indirectly by way of an affiliate firm, and were unregulated by state law in respect of the amounts and categories of fees and costs which they could charge for granting a mortgage loan.
As interest rates escalated during the last decade, available mortgage funds within the state became scarcer, and the home-buying public found it increasingly difficult to obtain mortgage financing from traditional sources regulated by the Commissioner of Banking, namely, the savings and loan institutions and the savings and commercial banks. Cf. Application of Howard Savings Institution of Newark, 32 N.J. 29 (1960); Suburban S. & L. Assn. v. Comm'r of Banking, 150 N.J. Super. 339 (App.Div. 1977). The mortgage banking community responded to the home buyers' need, increasing its share of the home mortgage market and indeed coming to dominate that market even after it was reentered by the depository banks. *591 These phenomena and the abuses they spawned were well-documented in the joint public hearings conducted by the Senate Labor, Industry and Professions Committee and the Assembly Banking and Insurance Committee on the bills enacted as N.J.S.A. 17:11B-1, et seq. See Public Hearings on S-975 and A-755, A Bill to Provide for the Licensing and Regulation of Mortgage Bankers, Mortgage Brokers and Mortgage Solicitors by the Commissioner of Banking (March 19 and April 3, 1980).
The leitmotif of those hearings was the capacity for abuse and overreaching inherent in the mortgage banking industry's uncontrolled fee structure. While various federal home-financing programs and applicable federal legislation address some of these concerns by limiting specific categories of charges in particular transactions, primarily FHA and VA insured loans, and by requiring disclosure in other transactions, it nevertheless appeared that there were sufficient interstices in the federal regulatory scheme to permit substantial overreaching by mortgage lenders in the absence of state control.
The heart of the bill, and the subject of the most vociferous protest by the mortgage banking industry, which opposed the bill, was section 13b, which accorded the Commissioner the power to establish fee guidelines. As enacted, however, that section imposed even stricter controls on the proposed fee structure by specifying the categories of chargeable fees, prohibiting the charging of any other categories of fees and subjecting to the fee structure loans insured or guaranteed by an agency of the federal government to the extent applicable federal law or regulation does not otherwise require. See N.J.S.A. 17:11B-13(b), (c) and (d).[1] Although N.J.S.A. 17:11B-13(b) *592 authorized the Commissioner of Banking to establish guidelines, by rules and regulations, to determine the reasonableness of permissible fees, the regulations actually promulgated omit any specific monetary guidelines. See N.J.A.C. 3:38-1.1, et seq.
It was also evident to the legislative committees that the vulnerability of the home-buying public to overreaching on the part of the mortgage banker is very much intensified when the borrower relies on the real estate broker, who negotiated the sale in the first instance, to assist him in obtaining his mortgage financing. See, e.g., Public Hearing, supra, March 19, 1980, at p. 6A. It is that perception and its validity which is the crux of the issue here.
By way of general focusing of the problem, it is clear that when a real estate broker functions in his typical role as agent for the seller, he has an obvious self-interest in seeing to it that the prospective buyer can procure mortgage financing. Since the vast majority of home purchases are financed by the mortgage loan obtained by the buyer, the ability of the buyer to obtain that loan is critical not only to the consummation of the sale between buyer and seller but also to the broker's right to payment of his commission by the seller. That, of course, is so because the broker's right to his commission is dependent, if not upon actual consummation of the sale, then at least upon his production of a buyer who is willing, ready and able. See generally Ellsworth Dobbs, Inc. v. Johnson, 50 N.J. 528 (1967). In either case, the buyer's financial ability, ordinarily dependent on the mortgage loan, is the key to the fulfillment of the economic expectations of all three. Thus, if not technically part of the sales transaction itself, the buyer's mortgage transaction is nevertheless an integral, indispensable and contemporaneous functional component of the sales transaction.
*593 To some extent the buyer, seller and broker have a mutuality of interest in the buyer's obtaining of a mortgage loan. The buyer cannot buy without it, the seller cannot sell without it, and the broker cannot realize his commission on the sale without it. But the respective interests of each of these three are not altogether congruent, and to the extent they do not overlap there is a substantial potential for conflict of interest and self-dealing on the part of the broker. That potential is enhanced if the broker is able to profit from the mortgage transaction as well as from the sales transaction. This is true because, irrespective of the broker-seller agency relationship, the buyer ordinarily believes that the broker is acting for him when he assists him in obtaining mortgage financing. As one member of the Assembly Committee expressed it, the buyer is the broker's "captive audience" vis-a-vis his required mortgage financing (Statement of Assemblyman Kosco, March 19, 1980 at 6A).
This "captive audience" characterization proceeded from the assumption, supported by the hearing testimony, that the average home buyer is relatively untutored in the intricacies of the mortgage market, especially the intensely competitive mortgage banking market of recent years. While he may be aware of his opportunity to shop for interest rates, he is ordinarily not aware that the discount points and processing fees charged by the mortgage bankers and which can add significantly to the overall cost of the mortgage loan are also variables to be taken into account in shopping for the loan. In any event, the buyer ordinarily places trust and confidence in the broker and relies on the broker's advice and assistance in the procurement of the mortgage loan because he is led by the broker to believe that the broker is acting on his behalf as a borrower in placing the loan. An insidious variation of this theme is the broker inducing the buyer to believe that in order to complete the sales transaction, he must permit the broker to place his mortgage *594 loan for him.[2] The point, of course, is that the buyer has a reasonable expectation that the broker will assist him in obtaining the financing on terms as advantageous to the buyer as possible, not on terms as advantageous to the broker as possible. The broker, moreover, has an obligation to the seller, whose agent he is in the sales transaction, not to direct the seller into a mortgage arrangement which might require the seller to contribute to the buyer's mortgage loan costs[3] or which would unduly delay or complicate the title closing. Clearly, if the broker has a financial interest in steering the buyer to a particular mortgage-banker source, irrespective of the availability of mortgage financing from a different mortgage banker or a depository bank which would better serve the interests of buyer, seller or both, he is sorely tempted and highly motivated to serve his own self-interest to the disadvantage of his principals.
There are two major forms which the broker's pursuit of this self-interest can take. The simplest is the payment to the broker by a lender with whom he is not affiliated of a commission for steering the loan. It is, moreover, likely that the lender will pass on to the borrower his commission costs by way of additional points. More complex is the situation where the real estate broker is affiliated by common ownership with the mortgage banker who grants the loan. In that case the real *595 estate broker, by steering the loan, places himself in a position to enjoy the profits accruing from the grant of the loan. It is in the context of the real estate broker/mortgage banker affiliation that the controversy before us arises.
In the spring of 1983, a series of letters was addressed to the Real Estate Commission by MBA and intervenor, First Boston Capital Group, Inc. (First Boston). This correspondence arose out of a plan by First Boston, referred to by it as "Shelternet," which was brought to the attention of MBA by an article which appeared in the Wall Street Journal. First Boston wrote to the Commission seeking from it an advisory opinion that the plan did not violate N.J.S.A. 45:15-17(i), and MBA wrote to the Commission seeking an advisory opinion that it did. The essential concept of the plan was for First Boston, as a capital source, to lend money to New Jersey real estate brokers to enable them, upon obtaining the necessary mortgage banking license and establishing an affiliated mortgage-banking business identity, to themselves function as mortgage bankers for the sales transactions they negotiate, then discounting the mortgage loans back to First Boston and assigning to it the mortgage. Apparently, First Boston hoped to garner a substantial share of the mortgage-market by installing sophisticated computer equipment and programs in the offices of each participating real estate broker/mortgage-banker. The Shelternet program and others like it, which were apparently proposed by other capital sources, obviously constituted a serious competitive threat to the established New Jersey mortgage banking community. The basis upon which MBA, which represents that community, sought to counteract these competitive proposals was by reliance on N.J.S.A. 45:15-17(i) which authorizes the Real Estate Commission to take disciplinary action against a real estate broker who is found guilty of
Collecting a commission as a real estate broker in a transaction, when at the same time representing either party in a transaction in a different capacity for a consideration; ....
*596 In its correspondence MBA took the position that the purchase money mortgage is part of the sales transaction of which it is in aid and that the real estate broker who places the mortgage for the buyer is representing the buyer for financing purposes even if ostensibly paid by the lender. First Boston's position was that the sales transaction and the mortgage transaction are separate and independent of each other and that in any event the broker does not represent the buyer in the mortgage transaction since he is paid by the lender or enjoys a profit as a lender.
The Commission did not respond to this correspondence for almost a year although it apparently advised its correspondents that it was seeking an opinion of the Attorney General. No opinion, however, was ever forthcoming and in order to obtain a resolution of the controversy, MBA instituted an action in the Chancery Division in February 1984 against the Real Estate Commission and intervenors ERA Mortgage, Inc. and Electronics Realty Associates, affiliated companies in, respectively, the mortgage banking and real estate brokerage businesses (collectively, ERA). The complaint sought an order requiring the Commission to determine the legality of the double compensation practice in the purchase money mortgage/sale situation and to institute proceedings under N.J.S.A. 45:15-17(i) against ERA. It also sought an injunction barring ERA from continuing to earn double compensation by negotiating the sale and lending the mortgage money.
Shortly after the filing of the Chancery action, MBA, ERA and the Attorney General's Office were able generally to agree in principle that the statutory-construction question should be submitted in the first instance to the Real Estate Commission for its determination after a plenary hearing. Before this agreement could be consummated, however, the Commission at its regularly scheduled meeting of March 22, 1984 discussed the pendency of the MBA action. Its minutes reflect the following:
A lengthy discussion among the Commissioners and staff and Deputy Attorney General discuss the entire issue, including the requests for advisory opinions *597 made by several brokers beginning last Spring. The consensus appeared to be that a policy decision was required. Commissioner Runner moved that the Commission would not consider N.J.S.A. 45:15-17(i) to be violated by a dually licensed broker who receives fees or commissions for rendering services in two or more licensed capacities in the same transaction. Commissioner James seconded. All those in attendance voted affirmatively.
In implementation of the determination made at that meeting, the Commission, by its Director, sent a letter to First Boston's attorney responding to its original inquiry of the year before. The letter advised counsel of the content of the motion made and adopted at its March 22 meeting. The letter explained the Commission's reasons for that action as follows:
Nevertheless, because of the public perception that individuals performing services on behalf of buyers owe them some duty of loyalty, and because N.J.A.C. 11:5-1.23(a) mandates brokers deal fairly with all parties, it is appropriate that the Commission directly decide the "conflict of interest" issue. This issue represents the reason for being of N.J.S.A. 45:15-17(i). Because a buyer looks to the real estate broker for guidance and advice, and because a broker may receive additional compensation to assist in obtaining a mortgage, there exists a potential for abusive steering toward a particular source of financing. Such steering could result in buyers obtaining mortgage financing at less favorable terms than exist in the market generally. When brokers are prohibited from collecting fees for such assistance, a buyer is more likely to explore alternatives and obtain the most favorable terms.
Balanced against this potential for abuse are the realities of the mortgage market. In the last several years the most difficult task of buyers is to find mortgage financing at terms they can afford. Mortgage interest rates remain at historically high levels. Innumerable transactions have failed for lack of mortgage financing, to the detriment of both sellers and buyers. If real estate brokers can widen the opportunity to obtain mortgage financing, then the public interest will be served. Moreover, because of economies of overhead and scale, they may do so in a competitively more efficient manner, thus reducing the parties transaction costs.
In weighing these two competing and opposite public interests, the Commission is mindful of the duties and responsibilities of brokers described in N.J.A.C. 11:5-1.23(a). Abusive steering is thereby prohibited; other provisions of the License Act and regulations may also apply to punish such actions depending upon how they occur. Thus the question to be decided is whether to impose a general prohibition, which disserves both the public and the industry, or to punish specific misconduct individually. The Commission opts for the latter.
The letter concluded with the "suggestion" that real estate brokers placing mortgages should, by an initial document executed by the buyer, disclose the broker's role and compensation in the mortgage transaction and make such disclosure to the *598 other parties to the transaction. The Commission's letter also suggested that "the broker should always be aware of other sources and terms of available mortgage financing and advise the buyer about them, giving the buyer an opportunity to choose. To avoid subsequent misunderstanding, brokers may wish to document this advice."
None of the other original correspondents to the Commission was furnished with copies of this letter. MBA learned of it some time late in May 1984 and made an emergent application to this court for a stay of the ruling as explained by the letter. The panel which entertained the application entered an order, consented to by all parties, remanding the controversy to the Real Estate Commission for an advisory ruling pursuant to N.J.S.A. 52:14B-8 to be based on a plenary hearing. A hearing was held at which only MBA introduced proofs. Upon completion of the hearing the Commission by a 5-3 vote, reaffirmed its decision as set forth in the April 24, 1984 letter to First Boston's counsel. Interestingly, Commissioner Runner, who had made the original motion at the March 22 hearing, the passage of which was the basis of the April 24 letter, was one of the three dissenters and filed a separate opinion concluding that the double compensation practice was a clear violation of N.J.S.A. 45:15-17(i). Of note is his observation that
The Attorney for ERA asserted that the licensee when assisting in procuring a mortgage is actually working for the mortgage company and therefore is not representing the buyer, and therefore is not a party to the transaction.
I know from twenty years of experience as a real estate broker that even though the mortgage representative may be employed by the mortgage company, the buyer is under the impression that he IS representing the buyer and therefore is a party to the transaction in a different capacity if he were a real estate licensee.
I would like to note that the recommending of a mortgage source, or the assisting the buyer in filling out a mortgage application should be construed as a normal service to be rendered by the licensee and an integral part of the selling transaction and the licensee should NOT be entitled to a fee for such service.
MBA appealed.
At the outset we disagree with the assertion of the respondent Commission and the intervenors that MBA does not *599 have sufficient standing to challenge the Commission's ruling. It is well-settled in this jurisdiction that a nonprofit association has standing to sue as the sole party plaintiff to protect or prosecute the common rights of its members. See U.S.A. Chamber of Commerce v. State, 89 N.J. 131 (1982); Crescent Pk. Tenants Assoc. v. Realty Eq. Corp. of N.Y., 58 N.J. 98 (1971). This standing principle is dispositive here.
We also reject MBA's challenge to the procedural efficacy of the Commission's 5-3 vote. MBA argues that three of the affirmative votes were improperly cast, two because they were cast by Commissioners who had only read the hearing transcripts and had not been themselves present at the full hearing and a third because it was cast by an allegedly "illegal" second public member of the Commission, Commissioner Colitsas. We are satisfied that the two Commissioners who had not attended the full hearing of the Commission but who had read the transcripts cast valid votes. See In re Shelton College, 109 N.J. Super. 488 (App.Div. 1970). And compare In re North Jersey District Water Supply Commission, 175 N.J. Super. 167, 190-193 (App.Div. 1980), certif. den., 85 N.J. 460 (1980). We are also satisfied that when read in pari materia, N.J.S.A. 45:1-2.2 (L. 1977, c. 285, § 1) and N.J.S.A. 45:15-5 (L. 1977, c. 331, § 1) provide for an eight-person membership for the Commission consisting of five industry members, two public members, and one member representing a department of government. At the time of the vote, there were two public member Commissioners, Commissioner Colitsas and Commissioner Queen. We conclude that both were members of the Commission, each with the right to cast a vote.
The questions raised by the substance of the ruling are more difficult. To begin with, we are satisfied that the Commission, in rendering its ruling, failed properly to address the threshold issue of the meaning of N.J.S.A. 45:15-17(i). Its ruling constituted a policy determination that, in certain circumstances and under certain conditions, the evident disadvantages *600 to the home-buying public which would result by permitting the real estate broker to earn double compensation would be outweighed by its advantages if fair disclosures were made by the broker. It was not, however, free to address this issue on a policy basis if the Legislature had already itself determined the policy issue. We agree with the minority opinion of the Commission and hold that the legislative mandate expressed by N.J.S.A. 45:15-17(i) prohibits double compensation in the situation here whether or not disclosure is made.
We first reject the theory that the prohibition of N.J.S.A. 45:15-17(i) can, as a matter of statutory construction, be overcome by the real estate broker's disclosure of his double compensation to the affected parties. N.J.S.A. 45:15-17 constitutes the catalogue of proscribed broker conduct. Subsection (b) of N.J.S.A. 45:15-17 prohibits "acting for more than one party in a transaction without the knowledge of all parties thereto." Subsection (i) does not contain such a disclosure qualification. More significantly the original assembly bill which resulted in L. 1977, c. 331, amending various sections of N.J.S.A. 45:15-1, et seq., had proposed an amendment of subsection (i) which would have permitted dual compensation upon "full disclosure in writing." See Assembly Bill 292, § 5(i) (1976). That proposal was eliminated from the enacted version, and we are constrained to assume that the elimination was purposeful. See, e.g., N.J. Pharmaceutical Ass'n v. Furman, 33 N.J. 121, 130 (1960). We are thus persuaded that by the juxtaposition of subsections (b) and (i), the Legislature's intent was to permit dual representation by consent but only if there was no dual compensation therefor. The basis of such a policy decision is self-evident. Dual representation may be a convenience and an accommodation for the parties to the transaction for which they have a right to opt, so long as all parties understand which of them is paying for the broker's engagement. Payment by more than one, however, may well carry with it a substantially greater potential for conflict of interest *601 since each party paying the consideration will believe himself entitled to the broker's primary allegiance.
Since disclosure and consent cannot be read into subsection (i), the only question remaining is whether the broker's double compensation in receiving a commission from the seller and a consideration for placing or granting the buyer's purchase money mortgage loan comes within the statutory prohibition. It does if the sale and mortgage transaction are, effectively, components of the same transaction and if the broker represents more than one party to the transaction. The intervenors contend that the broker, in placing the mortgage, does not represent any party to the transaction other than the seller for two reasons: first, because the mortgage transaction is separate from the sales transaction, and second, because the broker in placing the mortgage loan is paid by the lender or receives profit as the lender and does not therefore "represent" the buyer as borrower.
As to the first of these contentions, we are convinced that the two transactions are so closely entwined, so interdependent and have so great a potential for conflict of interest and self-dealing on the part of the broker as to require the conclusion that at least for purposes of this statute they are each a part of the single, overall transaction which takes place when a purchaser buys real estate financed by a purchase money mortgage loan.
We are also persuaded that in that overall transaction a broker receiving a commission from the seller would also be "representing either party in a different capacity for a consideration" if he is also paid by the borrower or lender for his services in the mortgage transaction. First, it appears to us that because of the unitary nature of the transaction there are actually three parties to it in addition to the broker: the buyer, the seller and the lender. We are aware that subsection (i) is drawn in terms of "either party," a phrase implying only two parties to the transaction. Nevertheless, we cannot conclude *602 that the statute was not intended to apply to multiparty transactions. Clearly, it does. Subsection (b), it is true, expressly refers to "more than one party." But subsection (b) and subsection (i) were enacted at different times,[4] a fact which may explain their different verbiage. We do not believe, however, that they express different concepts respecting the possible number of parties to a transaction, particularly in view of the "different capacity" verbiage of subsection (i). Nor do we perceive any basis for concluding that the class protected by subsection (i) was intended by the Legislature to be narrower than the class which had been previously protected by subsection (b). As we have already said, subsection (b) prohibits a real estate broker from acting for more than one party without the knowledge of all. Subsection (i) prohibits the real estate broker from acting for more than one party for more than one consideration, irrespective of knowledge. Considering the broad range of services which a broker is authorized to perform by N.J.S.A. 45:15-3 and which can be performed in a single transaction, we are persuaded that reading subsection (i) as limited to a two-party transaction would abrogate legislative intent as well as common sense. We also point to N.J.S.A. 1:1-2, prescribing the rule of construction that use of the singular "shall be understood to include and to apply to several persons or parties as well as to one * * *."
Even if the purchase money mortgagee were not a party to the overall transaction within the intendment of subsection (i), we would nevertheless conclude that the prohibition of the statute applies because, in the context of its prohibition, we regard the broker as "representing" the buyer in the placement of the mortgage loan. We base this conclusion on the reasonable belief of the buyer, generated by the totality of the circumstances of his relationship with the broker, that the *603 broker is acting for him in performing this service. After all, a member of the public dealing with a real estate broker who undertakes a service for him has a reasonable expectation that the broker's conduct will conform to the standards of a fiduciary rather than those of a merchant.
Our dissenting colleague draws what we believe to be an insupportable distinction between the real estate broker as a fiduciary and a real estate broker as a merchant. We all agree that if the real estate broker is the seller's agent in the sales transaction, subsection (i) prohibits him from undertaking, for a consideration, the express engagement to act as the buyer's mortgage broker, searching out for the buyer the best available purchase money mortgage loan. That consequence follows because in such an engagement, as we all agree, the real estate broker would clearly be representing the buyer as a fiduciary. The dissent concludes, however, that if the broker does not undertake to shop for the mortgage loan in order to procure the best available loan for the buyer but is himself the seller of the loan, he is free to profit from the loan transaction because he is representing neither the buyer nor the seller but his own financial self-interest. In our view, this proposition is untenable, unrealistic and produces a result which is immeasurably more harmful to the public than the evil which the dissent agrees was intended to be addressed by the Legislature in subsection (i). We simply cannot conceive that the Legislature could have meant to prohibit the seller's sales broker from acting as the buyer's mortgage broker while at the same time permitting the sales broker to profit from placing the loan not for the advantage of either party but for his own advantage. We therefore adhere to the conclusion that the sales broker who places the purchase mortgage loan is, for purposes of this statutory provision, chargeable as "representing" the buyer.
In resisting this conclusion, the intervenors place primary reliance on the argument that when the sales broker steers or places the mortgage loan, he is representing the *604 lender rather than the buyer. But that assertion is contrary to economic reality. Where the real estate broker, by a wholly owned affiliate, grants the loan, his profit on the transaction obviously comes out of the borrower's pocket. Where the real estate broker places the loan, the lender may be initially paying the broker's commission for the referral but, in the ordinary course, the buyer, perhaps with the seller's assistance, will ultimately reimburse the lender for this disbursement. N.J.S.A. 17:11B-13(b) permits the mortgage banker to charge the borrower for reimbursement "for charges imposed by third parties." Neither the statute nor the implementing regulations define such charges. See N.J.A.C. 3:38-2.1(b). The statute does, however, permit the mortgage banker to pay a "commission, bonus or fee" for "arranging or originating a mortgage loan for a borrower." N.J.S.A. 17:11B-14(d). As a matter of ordinary parlance, such a commission fee or charge would constitute a charge imposed by a third party. The commission or fee may, however, be paid only to a person licensed as a mortgage banker or to a person exempt from licensure pursuant to N.J.S.A. 17:11B-2. Exempt persons include those who are "licensed as a real estate broker or salesman pursuant to Chapter 15 of Title 45 of the Revised Statutes, and not engaged in the business of a mortgage banker or broker." N.J.S.A. 17:11B-2(d). Clearly then a commission chargeable by a real estate broker is a third party charge which the mortgage banker can pass to the borrower. The intervenor's assertion that the borrower is not paying the consideration which the broker receives from the lender is not, therefore, tenable in the real world.
We further point out that there is no inconsistency between the Mortgage Bankers and Brokers Act which permits payment of a commission to a real estate broker and N.J.S.A. 45:15-17(i), which prohibits double compensation. When the two acts are read in pari materia, it is plain that the Legislature, in the Mortgage Bankers and Brokers Act, was protecting the real estate broker's right to compensation for placing the *605 loan where that is the primary service he is performing. After all, not every mortgage loan is an integral part of the sales transaction. We see no logical imperative or policy consideration which would justify the conclusion that anything in the Mortgage Brokers Act was intended to modify the conflict of interest prohibition expressed by N.J.S.A. 45:15-17(i).
Nor do we find merit in the intervenor's suggestion that the broker's placing of the mortgage loan is comparable to and no more violative of subsection (i) than is his sale as a licensed insurance agent or broker of homeowner's insurance to the buyer. If we assume that receipt of the commission on the sale and receipt of the commission on the insurance contract did not violate the statute, we regard the mortgage and the insurance as essentially different insofar as the concern of the statute is involved. The costs of insurance and of mortgage money are of different orders of magnitude. Homeowner's insurance, moreover, is available only from a highly regulated industry, at relatively standard rates, and on relatively uniform terms. A mortgage loan, on the other hand, is not a standardized or nearly standarized product. Furthermore, the buyer does not make a 20- or 30-year commitment when he purchases insurance. He can change his insurance carrier and his agent annually. He is not bound for the life of the mortgage if his first insurance premium should turn out to have been excessive. More significantly, however, the buyer's purchase of insurance coverage ordinarily has no effect at all on the seller's interest in efficiently, speedily and economically consummating the sale. The buyer's financing arrangement, on the other hand, substantially affects or has the capacity substantially to affect the seller's basic interests.
The intervenors are apparently of the view that the holding of more than one professional or business license permits the license holder to exercise fully all of the prerogatives of each license irrespective of the consequences to the public with which he deals in his dual capacity. This is patently *606 not so. Double license holding does not permit the license holder to exercise the prerogatives of one license in a manner that will result in a violation of the obligations, and particularly the fiduciary obligations, imposed upon him by the other. The fact that a real estate broker or his affiliate also holds a mortgage banker's license obviously confers no warrant for excepting him from the professional standards prescribed by the Legislature for each of his business ventures. Our point is effectively demonstrated by ERA's assertion that
* * * `efficiencies' result where the mortgage delivery system is centralized at the point of sale (i.e., the real estate broker's office) * * *; the programs at issue thus offer the twin advantages of accelerated mortgage processing time and reduced costs to homebuyers.
There is absolutely nothing in this record or in the legislative history to demonstrate that this is true. Indeed, the contrary seems to be the case. As we understand the concerns expressed by the Commission itself in its April 24 letter, the advantages of the centralized mortgage delivery system would accrue primarily to the broker and the lender, not to the buyer and the seller. The system in our view would simply promote the opportunity and the temptation of the broker for abusive steering.[5]
We are aware that much of what we have said has particular relevance to the home-purchase transaction. The statute makes no distinction between residential sales and commercial sales, and we see no basis upon which we could or should *607 ourselves draw that distinction. We regard our holding respecting the sale and mortgage transactions as equally applicable, therefore, to both.
We make one final procedural observation and that relates to the advisory-ruling technique employed by the Commission in considering the issue before it. N.J.S.A. 52:14B-8 permits an administrative agency to make a declaratory ruling "with respect to the applicability to any person, property or state of facts of any statute or rule enforced or administered by that agency." It provides that the ruling shall bind the agency and the parties to the proceedings. It also requires an opportunity for hearing to be afforded to interested parties.
Essentially, the declaratory ruling is in the nature of an exercise of quasi-judicial power. The New Jersey Supreme Court, however, has recognized the administrative law principle that when an agency has been accorded rule-making power, it is by an exercise of that power rather than by the adjudicative process that it must address, "`broad policy issues' that affect the public-at-large or an entire field of endeavor or important areas of social concern, or [where] the contemplated action is intended to have wide application and prospective effect." Crema v. New Jersey Dept. of Environmental Protection, 94 N.J. 286, 299 (1983). There can certainly be no doubt that the issue here meets the criteria of Crema.
We further note that the hearing which the Commission here held did not meet the requirement of N.J.S.A. 52:14B-8 for affording to all interested parties a full opportunity for hearing. The mortgage banking industry was represented as were those real estate brokers interested in taking advantage of the "Shelternet" and like programs. But there was no notice or opportunity to be heard given to anyone representing the interest of the parties most affected, the homebuyers of this state. We note, for example, the participation of both the Attorney General and the Public Advocate on behalf of the public in the proceedings arising out of the proposed settlement of litigation *608 between the bar and the realtors of this state. See N.J. State Bar Ass'n v. N.J. Ass'n of Realtors Bds., 93 N.J. 470, 474 (1983). We regard the issue here presented respecting the practices of real estate brokers to be as significant and to require the same solicitous protection of the public interest as that raised in N.J. State Bar Ass'n. There are, moreover, other interested parties who were not noticed of the Commission hearing, including the depository banking community which offers a viable and perhaps, in particular cases, a more economical mortgage financing alternative to the public.
Our further observation respecting the procedural insufficiency of the proceedings below stems from the jurisdiction over the mortgage-banking industry accorded to the Commissioner of Banking by N.J.S.A. 17:11B-1, et seq. The Commissioner of Banking, by an exercise of the rule-making power granted by N.J.S.A. 17:11B-13(a), has the power to address, by the promulgation of regulations, virtually the same question which was the subject of the Real Estate Commission's declaratory ruling. The Commissioner of Banking could well opt to promulgate regulations which would be contrary to the Real Estate Commission's ruling, and which would bind the mortgage bankers irrespective of the Real Estate Commission's approval vis-a-vis real estate brokers. At the very least, therefore, the Commissioner of Banking is an interested party who might have had an important point of view to present to the Real Estate Commission. Compare Hinfey v. Matawan Regional Board of Education, 77 N.J. 514 (1978). Beyond that, the Commissioner of Banking and the Real Estate Commission might well have desired the opportunity to conduct joint public hearings under their respective rule-making powers in order to insure consistency of action following the solicitation of the views of all segments of the community and the fullest possible factual presentation. For these reasons, we are persuaded that an exercise of the rule-making power would have been the only appropriate mode for determination by the Commission of the issue here presented and for formulation by it of the conditions *609 and standards pursuant to which a double compensation practice would be allowable. The declaratory ruling was inadequate as a technique for binding the whole industry and the public-at-large and for eliciting a sufficient factual basis for the Commission's action.
The declaratory ruling of the Real Estate Commission appealed from is reversed. We hold that under N.J.S.A. 45:15-17(i) a real estate broker receiving a commission from the seller may not receive compensation for placing or granting the buyer's purchase money mortgage.
BRODY, J.A.D., dissenting.
Traditional barriers separating the sellers of different financial services are fast disappearing. Services offered by savings banks are barely distinguishable from those offered by commercial banks. Banks now act as investment brokers, sell life insurance and annuities, and grant second mortgages. Investment brokers offer checking accounts and credit services formerly offered only by banks. Legislation and regulations that once defined the boundaries of exclusive segments of the financial market are giving way to "deregulation." Legislators no longer see a need to deny consumers the convenience of "one-stop shopping" for a variety of financial services so long as they remain free to "shop around," if they choose, for the best values and the best advice.
Predictably those who enjoy an exclusive hold on a segment of the financial marketplace try to protect their preserve by adversely criticizing those who want to enter it. They describe the threat of competition, usually considered a benefit to the consumer, as the consumer's enemy. They portray the seller of multiple financial services as a rogue or at best an amateur, and portray his customers as a helpless "captive audience" seduced by circumstances into the clutches of a wily merchant who falsely claims the ability to fairly satisfy all their needs.
*610 The Mortgage Bankers Association of New Jersey (MBA), an association of established mortgage bankers, is attempting in this litigation to prevent the broker of a residential or commercial real estate sale from also "selling" the buyer a purchase-money mortgage. MBA contends that N.J.S.A. 45:15-17(i) (subsection 17(i)) bars a real estate broker from engaging in this activity. The Real Estate Commission (the Commission) ruled that the statute is not a bar because it prohibits the broker from collecting his commission from the seller only if he also receives consideration for representing the buyer. It determined that selling the buyer a purchase-money mortgage is not "representing" him.
Our function is not to pass judgment on the trends and forces at work in the market. Nor are we to ascribe to the Legislature an intent to bar a broker from every business transaction that could produce some conflict. A broker is licensed to bring together the parties to a transaction. Because his commission is contingent, the broker's interest often conflicts with his principal's as he coaxes both parties towards agreement. The Legislature tolerates some conflicts and therefore so must we. Our function is to determine whether subsection 17(i) means what MBA contends or what the Commission has determined. The majority agrees with MBA. I agree with the Commission and therefore respectfully dissent.
The matter is before us for review of the Commission's declaratory ruling made pursuant to N.J.S.A. 52:14B-8 which provides in pertinent part:
... [A]n agency upon the request of any interested person may in its discretion make a declaratory ruling with respect to the applicability to any person, property or state of facts of any statute or rule enforced or administered by that agency. A declaratory ruling shall bind the agency and all parties to the proceedings on the state of facts alleged. Full opportunity for hearing shall be afforded to the interested parties. Such ruling shall be deemed a final decision or action subject to review in the Appellate Division of the Superior Court.
*611 It is important to emphasize that the declaratory ruling under review binds the Commission only on "the state of facts alleged" by the "interested person" who requested the ruling.
The request in this case was made by First Boston Capital Group, Inc. (First Boston). The "state of facts alleged" appears in its letter to the Commission as follows:
Several New Jersey real estate brokers wish to operate their own mortgage company. Under the plan contemplated by these real estate brokers, a licensed real estate broker would operate the mortgage company as part of its existing operations, or through a separate corporation which would be owned by the real estate brokerage company, by the principals of the real estate brokerage company, by two or more real estate brokerage companies, and/or by the principals of two or more real estate brokerage companies (hereafter, such separate corporation shall be referred to as the "affiliated corporation").
Where the mortgage loans are to be originated as part of the real estate broker's existing operations, the real estate broker will obtain, in addition to its existing real estate broker license, a license under the New Jersey Mortgage Banker's and Broker's Act (N.J.S.A. 17:11B-1 et seq.) as a "mortgage banker." Where the mortgage loans are to be originated by an affiliated corporation, such affiliated corporation will obtain such a "mortgage banker" license.
Prior to entering into any lending transaction, the real estate broker would disclose to both the buyer and the seller: (1) the identity of the parties represented by the real estate broker in its capacity as a real estate broker, (2) the relationship of the real estate broker to the mortgage operation (e.g. the fact that the mortgage will be originated by the real estate broker itself, or where applicable, by the affiliated corporation), (3) the nature and amount of fees associated with the mortgage application and closing, and in particular which of those fees would go to the lender, (4) the identity of the parties which would pay for such fees, and (5) the fact that the borrower is free to obtain a mortgage loan from another source (e.g. real estate brokerage services are not conditioned on use of the real estate broker's mortgage operations).
Several real estate brokers in New Jersey have been approached by a FNMA-approved seller [First Boston] with a substantial net worth offering a program under which such entity would assist the real estate brokers in establishing and maintaining mortgage operations. The investing entity would, in addition to providing computer services to support mortgage operations, offer a line of credit agreement in excess of $1,000,000.00 to be used for originating mortgage loans. The entity would also provide a commitment to purchase mortgage loans originated by the real estate brokers. In sum, by establishing mortgage companies with the assistance of the above-described program, New Jersey real estate brokers could facilitate real estate transactions by providing much needed mortgage funds on a direct basis.
*612 The "declaratory ruling" requested in the letter is as follows:
We hereby request that you provide us with an official written interpretation of N.J.S.A. 45:15-17(i). More specifically, we request that you confirm our opinion that N.J.S.A. 45:15-17(i) does not prohibit a licensed real estate broker from originating residential mortgage loans, as part of its existing operations or through a subsidiary or affiliated corporation, as long as the licensed real estate broker fully discloses to both seller and buyer prior to the loan transaction the following information: (1) the relationship of the real estate broker to the mortgage lending operation, (2) the identity of the parties represented by the real estate broker as a real estate broker, (3) the amount of mortgage fees to be paid to the mortgage operation and (4) the identity of the party which will pay such fees.
The ruling appears in two letters that the Commission sent to First Boston's attorney. The second letter merely reaffirms the ruling contained in the first. During the four-month interval between the letters, the Commission conducted a hearing pursuant to our order so that MBA and the other "interested parties" would be given a "[f]ull opportunity for hearing" as required by N.J.S.A. 52:14B-8. Only MBA submitted evidence at the hearing. In its ruling, the Commission advised First Boston that subsection 17(i) does not prohibit the state of facts alleged. It construed the language of the statute as follows:
... Thus by receiving compensation for such services, the broker is not being paid for "representing" the buyer. When the broker originates the mortgage he or she becomes a party, not a representative of a buyer. Reference in the statute under consideration to "either party" can only be construed to mean the buyer and the seller.
N.J.S.A. 45:15-17 lists prohibited conduct that jeopardizes the license of a real estate broker or salesman. In the years following its initial adoption as L. 1921, c. 141, the list has grown. Subsection 17(i) was added by L. 1953, c. 229. That subsection prohibits:
i. Collecting a commission as a real estate broker in a transaction, when at the same time representing either party in a transaction in a different capacity for a consideration; ....
By reason of subsection 17(i) a broker can no longer collect a commission from his principal if he is also paid for representing the other party in a different capacity. Under prior case law a real estate broker could represent the other party if his "principal has knowledge and assents to the other representation." *613 See Silverman v. Bresnahan, 35 N.J. Super. 390, 394-395 (App. Div. 1955).
In considering whether subsection 17(i) requires a broker to give up his commission from the seller if he sells a purchase-money mortgage to the buyer, the Commission properly focused upon the two key words of the statute: "either" and "representing."
By employing the word "either," the Legislature intended to limit the dual-representation bar to representing the two immediate parties to the transaction for which the broker is being paid his commission. In a sales transaction the parties are the seller and buyer; in a loan transaction, the lender and borrower. The words "either party" cannot be stretched to cover more than two parties and so do not include the purchase-money lender in a sales transaction. It therefore follows that in a sales transaction a real estate broker can be the purchase-money mortgagee or represent the purchase-money mortgagee for a consideration and not thereby forfeit his sales commission.
The majority mistakenly relies on N.J.S.A. 1:1-2 to construe "either party" to mean "any one of two or more parties." That statute provides in relevant part:
Unless it be otherwise expressly provided or there is something in the subject or context repugnant to such construction, the following words and phrases, when used in any statute and in the Revised Statutes, shall have the meaning herein given to them.
....
... Whenever, in describing or referring to any .. . party, ... any word importing the singular number ... is used, the same shall be understood to include and to apply to ... parties as well as to 1... party....
"Either" party means "the one or the other of the two" parties. Webster's Third New International Dictionary (G. & C. Merriam Company, 1966). The rule of construction permits pluralizing "one," but not increasing "the two" to more than two. Thus if a statute refers to one of two parties as a "buyer" and there is more than one buyer, N.J.S.A. 1:1-2 allows the singular word "buyer" to include all the buyers. The statute does not, *614 however, require or permit a statutory concept of "two" to be read as more than two.
When a seller engages a broker the only other party whom subsection 17(i) forbids the broker from representing is the buyer. By employing the word "representing," the Legislature intended to force the broker to choose between collecting a commission from the seller or accepting compensation for representing the buyer. Subsection 17(i) deems the representation of both immediate parties to a transaction so fraught with irreconcilable conflicting interests that the broker may not be compensated for both representations. On the state of facts alleged by First Boston, the broker will not undertake to represent the buyer. Quite the contrary, the broker will be selling the buyer the purchase-money mortgage if the buyer chooses to buy it from him, and the broker will expressly advise the buyer that he is "free to obtain a mortgage loan from another source."
The majority deals with this point by simply ignoring the meaning of the word "representing" and ipse dixit rewriting subsection 17(i) so that it prohibits a broker employed by a seller from selling the buyer a purchase-money mortgage (though not from selling him a casualty insurance policy).
One final point. Although there is some ambiguous language in the Commission's letter about the broker's "assisting a buyer in obtaining a mortgage loan," I do not understand that to mean that the seller's broker is free to represent the buyer in obtaining a purchase-money mortgage on the open market. That was not the state of facts presented to the Commission by First Boston. I agree with the majority that if the broker of a sale undertakes to find the most suitable purchase-money mortgagee for the buyer he would then be representing the buyer in that capacity, and if he accepts a fee from the lender subsection 17(i) requires that he forfeit his sales commission.
I would affirm.
NOTES
[1] Compare Assembly No. 755 (1980), § 13(b), which merely provided that

Except as otherwise permitted by law, the commissioner may, by rules and regulations, establish guidelines to determine the reasonableness of fees and commissions, including but not limited to direct or indirect costs or expenses incidental to the processing and closing of a mortgage loan transaction.
Paragraph (c) of § 13 of the bill, in contrast to N.J.S.A. 17:11B-13(d), exempted loans insured or guaranteed by an agency of the federal government.
[2] A form of realtor's sales contract, introduced in evidence at the Commission hearing, hereafter referred to, contains a clause requiring the buyer to apply for a mortgage through the broker's office.
[3] The testimony at the Commission hearing indicated that sellers are occasionally required to pay some of the discount points charged by the buyer's lender. This obligation may be required either by the mortgage contingency provision of the contract of sale or by the events thereafter occurring which lead a seller to conclude that his making of such a payment and thereby reducing his sale proceeds are necessary to "save the deal" to which his personal interests have already committed him. The seller's payment of mortgage discount points is especially likely in VA insured mortgage loans in which the lender is permitted to charge the buyer only one point. This one point limitation was formerly but is no longer applicable to FHA loans.
[4] Subsection (b) was part of the original enactment. Subsection (i) was added by amendment in 1953. See L. 1953, c. 229, § 5. There is no apparent legislative history of the 1953 amendment.
[5] While we need not fully address the Commission's reasoning, we nevertheless point out that its decision was apparently predicated on the notion that permitting the broker's double compensation would increase the public's opportunity to obtain mortgage financing. We have difficulty in following this reasoning. In our view, if mortgage financing from any source of which the broker is aware is available, the sales commission which the broker will realize from the seller if the sale is consummated should be sufficient incentive by itself for the broker to make these sources known to the buyer. If the broker, moreover, has no financial motivation for steering the buyer to a particular source, his advice to the buyer, permissible on disclosure pursuant to N.J.S.A. 45:15-17(b), will be likely to be significantly more objective in terms of both the buyer's and the seller's needs.