103 N.J. Super. 27 (1968)
246 A.2d 502
HIMC INVESTMENT COMPANY, A CORPORATION OF THE STATE OF PENNSYLVANIA, PLAINTIFF,
v.
THOMAS F. SICILIANO AND PHYLLIS SICILIANO, JOINTLY AND SEVERALLY, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided August 20, 1968.
*30 Mr. Clarence Blitz, attorney for plaintiff.
Mr. Donald M. Karp for defendants (Messrs. Lesnik & Amoscato, attorneys).
HORN, J.S.C.
This is an action on a promissory note secured by a mortgage second in lien upon a house owned by defendants. Defendants counterclaim for the cancellation of the mortgage and for the discharge of the underlying obligation. A jury was not demanded.
On December 10, 1965 defendants Thomas F. Siciliano and his wife Phyllis Siciliano, in response to a newspaper advertisement in the Asbury Park Evening Press, called the "First Prudential Co. of Penna.," listed in the advertisement at "S.E. Cor. 21st & Ranstead, Philadelphia, Pa. 19103," at the New Jersey telephone number referred to in the advertisement. At that time they supplied some information over the telephone as to their assets and earnings. They subsequently executed and submitted a loan application form.
On December 21, 1965 defendants received a telephone call from someone representing himself to be associated with National Consumer Service, Inc., telling them that *31 their loan application had been approved and to come to an address on 21st Street in Philadelphia the following day with a record of their outstanding debts and the deed to their property.
The next day, December 22, 1965, defendants went to the address to which they had been directed, and were first met by a man named "Vic." They spent about 15 minutes discussing the loan with him and were told that they would have to pay a $600 commission, and also that because of their youth, earning capacity and assets, they could borrow only $2,800 rather than the $4,000 they sought.
Vic then went out of the room and returned with one Hass, who repeated that they could only borrow $2,800 and that the amount of commission would be $600  $500 for lender and $100 for National Consumer Service, Inc., which he represented, and that if they made their payments on time, they might be eligible to borrow more. Then Vic and Hass left them alone to discuss whether they wanted to go through with the transaction because of the commission. Before they made up their minds they were told that the commission would only be $500.
Defendants agreed to the loan and signed their names to a number of legal instruments under Hass' direction of Mr. Hass. These included the promissory note for $4,431, payable to the order of Equity of Asbury Park, Inc. (Equity), on which the action was brought; a mortgage indenture in the same amount, also payable to Equity, and a closing statement detailing the disbursement of the borrowed moneys. The amount of the note was based on the principal purportedly loaned together with interest computed pursuant to the provisions of the Secondary Mortgage Loan Act, N.J.S.A. 17:11A-21, payable $73.85 per month for 60 months. They were given four checks signed by Hass, drawn upon the account of Provident Abstract Co., three of which they think they took with them, and the fourth, for $500, they endorsed and gave back to Hass. This check was subsequently endorsed by National Consumer Service, Inc. "for *32 deposit only." In the lower left-hand corner of this check, in Hass' handwriting, there was written the letter "C". Hass denied that this letter stood for "commission," but he could not offer any further explanation for it.
Two of the three checks that defendants believe they took with them, in the amounts of $804.87 and $845.72, were respectively made payable jointly to defendants and National State Bank, and to defendants and Fidelity Union Trust Co. to whom they were indebted. These, they believe, were endorsed by them and mailed to the respective banks. The words "Proceeds of Loan" were written at the bottom left-hand side of the third check for $649.41 which they took with them. This check was taken to the drawee bank and paid to defendants on the same day.
The mortgage loan was stated to be $3,268.32 on the closing statement. It represented $2,300, the sum of the above amounts of $804.87, $845.72 and $649.41, and the following: $500 actually taken by National Consumer Service, Inc. for commissions; $85.96 "Credit Life Insurance"; $93.94 "Accident and Health Insurance," and $288.42, the aggregate of charges for "Attorney's Fee," "Appraisal and Inspection Fee," "Search Fee," "Credit Investigation Fee" and "Recording Fee." Although the insurance charges were marked "Optional" on the statement, I find that defendants actually had no real choice and were compelled to accept the charges.
At the conclusion of the transaction defendants requested some memorandum of the transaction and were given a longhand note by Hass, acknowledging that the loan was made "pursuant to the secondary lien act of 1965 (passed about July)," an apparent reference to the New Jersey Secondary Mortgage Loan Act of 1965, N.J.S.A. 17:11A-1 et seq. (sometimes referred to herein as the "act"), which was approved on June 9, 1965. Before they left, Vic gave them a small clock radio as a gift.
The mortgage was assigned by Equity to M. Lippincott Mortgage Investment Co. (Lippincott) by an assignment originally dated December 22, 1965 and later changed to *33 the 23rd by writing over the "22." It was acquired by plaintiff from Lippincott on December 30, 1965 for $3,275.42. The note provided for payment to be made in Hammonton, New Jersey, where Lippincott maintained a one-man office in the same building (but not in the same office) as plaintiff. The location of Equity's office was not disclosed.
A short time after this transaction defendants received a letter from National Consumer Service, Inc. acknowledging their being customers and saying that if they supplied five names of possible customers they would receive a pocket radio as a gift. They supplied the names and received the radio. They subsequently received a coupon book directing them to make their monthly payments to "HIMCO" in Hammonton, New Jersey. Pursuant thereto they made four payments of $73.85 each, for January, February, March and April 1966. "HIMCO" is the same entity as plaintiff.
Some months later, when defendants finally received copies of the papers, Mr. Siciliano felt that they had been overcharged. He alleged that he then learned for the first time that they had executed a second mortgage upon a one-family dwelling they owned. Defendants consulted an attorney, and in May 1966, through their attorney's efforts and upon order of the New Jersey Banking Department, Equity returned to defendants the bill of sale for their automobile, which had apparently been obtained by it from National State Bank when the bank was paid.
In June 1966, again apparently as a result of efforts of their attorney, defendants recovered $500 from National Consumer Service, Inc., for which they executed a release discharging National Consumer Service, Inc. from any obligation in connection with the loan agreement but reserving all rights or defenses "in respect to third parties, relating to or arising out of a certain alleged mortgage dated December 22, 1965."
This transaction comes within the definition of a "secondary mortgage loan" contained in the New Jersey Secondary Mortgage Loan Act of 1965, N.J.S.A. 17:11A-1(a). *34 The statutory definition includes "a loan made to an individual * * * not to be repaid in 90 days or less which is secured in whole or in part by a mortgage upon any interest in real property used as a dwelling with accommodations for not more than 4 families, which property is subject to the lien of one or more prior mortgages * * *." Equity was licensed under that law.
No question of constitutionality of the act has been raised as in Crescent Investments Co. v. Commissioner of Banking and Insurance, 103 N.J. Super. 11 (Ch. Div. 1968). In any event, Judge Wick there held generally that the act was constitutionally valid.

CHOICE OF LAW
Plaintiff urges that this transaction is governed by the laws of the State of Pennsylvania, which laws, if applicable, would allegedly treat this transaction as a usurious one, with a forfeiture of interest only. This is in contrast to the treatment under the provisions of the New Jersey Secondary Mortgage Loan Act of 1965, which provides that "No obligation arising out of a secondary mortgage loan shall be enforceable in the courts of this State unless such loan was negotiated and made in full compliance with the provisions" of said act. N.J.S.A. 17:11A-29.
In choice of law cases, the courts favor a rule which resolves the question by applying the law of the state possessing the most substantial contacts with the transaction, and considers the public policy of the states which are involved, rather than the mere mechanical application of a rule based on ease of application and convenience rather than reason and rational analysis. Mellk v. Sarahson, 49 N.J. 226 (1967); Kievit v. Loyal Protective Life Ins. Co., 34 N.J. 475 (1961); Mount Vernon Fire Ins. Co. v. Gillian, 95 N.J. Super. 279 (App. Div. 1967); Present v. United States Life Ins. Co., 96 N.J. Super. 285 (Law Div. 1967).
An analysis of the contacts and the respective interests of the states involved, Pennsylvania and New Jersey, leads *35 to the inescapable conclusion that the law of the latter should apply; more particularly, the Secondary Mortgage Loan Act of 1965.[*]
The borrowers were New Jersey residents; the mortgage was on realty in New Jersey; the forum State is New Jersey; the solicitation for the loan was in a New Jersey newspaper; the defendants were invited to call the advertised New Jersey telephone number; the place of payment of the loan as originally provided in the promissory note is in New Jersey; and significantly, the lender's representative, both by written note given to defendants at the time of the transaction on December 22, 1965 and by letter to defendant's attorney dated April 13, 1966, acknowledged that the New Jersey act was applicable to the transaction.
In addition to an analysis and weighing of the contacts of the two states with the contract, it is an established rule that a contract valid where made will not be enforced in this State if it contravenes the public policy thereof, or is inconsistent with that policy as declared by the Legislature. Lobek v. Gross, 2 N.J. 100, 102 (1949); Minzesheimer v. Doolittle, 60 N.J. Eq. 394, 397 (E. & A. 1899). Flagg v. Baldwin, 38 N.J. Eq. 219, 244 (E. & A. 1884); Thompson v. Taylor, 65 N.J.L. 107, 109 (Sup. Ct. 1900).
The Secondary Mortgage Loan Act evinces a strong policy of this State which must not be disregarded, to wit, the protection of borrowers who come within its scope. I see no valid reason why the rule of Mellk, supra, a negligence case, should not be followed in contract cases. See the *36 Kievit, Mount Vernon Fire Insurance Co. and Present cases, supra.
For these reasons I hold that the law of this state governs.

HOLDER IN DUE COURSE
Plaintiff also contends that it occupies the status of a holder in due course of the promissory note, and thus is not bound by the "personal" defenses of defendants with respect to their obligation.
The Uniform Commercial Code, N.J.S.A. 12A:3-302 defines a holder in due course as one who takes an instrument for value and in good faith and without notice that it is overdue or has been dishonored, or of any defense against or claim to it on the part of any person.
N.J.S.A. 12A:3-304(1) (b) states that a purchaser of commercial paper has notice of a claim or defense if "the purchaser has notice that the obligation of any party is voidable in whole or in part."
N.J.S.A. 12A:3-307(3) provides that after the obligor shows that a defense to the obligation exists, a person claiming the rights of a holder in due course has the burden of proving that he is a holder in due course. To do this, plaintiff must show that it or some person under whom it claims is "in all respects" a holder in due course. "In all respects" means that it must sustain this burden by affirmative proof of the facts within the definition of a holder in due course. See N.J.S.A. 12A:3-302.
On the matter of plaintiff's proving the element of good faith, the New Jersey Study Comment to N.J.S.A. 12A:3-307 states that the holder "satisfies his burden with respect to good faith by testifying that he took the instrument in complete innocence and by disclosing the circumstance of the transfer."
Plaintiff has not introduced any evidence on this issue. Moreover, it cannot be disputed that Hass, the representative who closed the transaction for the lender, was well aware *37 of the terms of the New Jersey law on the subject of secondary mortgage loans.
Additionally, the various entities which took part in the transaction, including plaintiff, appeared to have had a prearranged method of handling such transactions, as shown by the proximity of the Lippincott office and plaintiff's in Hammonton, New Jersey; the provision in the note for payment at Hammonton; the swift transfer of the note and mortgage from Equity and, of course, the terms of the various other instruments which accompanied the transfer of the note.
All these circumstances show that plaintiff had actual knowledge (rather than a mere suspicion) of the legal deficiencies in the transaction.
Plaintiff was not a holder in due course. Consequently it took the promissory note subject to defenses raised here under the provisions of the Secondary Mortgage Loan Act. See N.J.S.A. 12A:3-306.

CONSEQUENCES OF THE APPLICATION OF THE SECONDARY MORTGAGE LOAN ACT
There were violations of the act, principally the extraction of a brokerage fee of $500, in violation of N.J.S.A. 17:11A-22(b), and the required purchase of insurance, in violation of N.J.S.A. 17:11A-22(c).
However, plaintiff claims defendants are estopped from raising the defense that the provisions of the Secondary Mortgage Loan Act were violated because under oath they executed the "Closing Statement" which in part provided: "We further aver and swear that there are no exceptions, defenses, set-offs or counterclaims now asserted or hereafter to be asserted against Equity of Asbury Park, Inc., their successors or assigns." It also relies upon the fact that defendants were both educated and knew and understood what they were signing.
I cannot agree. The act was promulgated because local and out-of-state lenders were engaging in such transactions *38 by fraud and chicanery. They procured borrowers through the means of false advertising. They then extracted "unconscionable amounts of interest as well as exorbitant fees." Crescent Investments Co. v. Commissioner of Banking and Insurance, supra.
As with the small loan business, the Legislature decided upon a policy of protection by regulation  not to illegalize the second mortgage loan business or to bind it so closely that it could not function. Edelstein v. Hub Loan Co., 130 N.J.L. 511, 513 (E. & A. 1943).
Consequently, the statute provides for licensing of lenders who desired to engage in such business in order to exercise some degree of control. N.J.S.A. 17:11A-2. The regulation was reasonably calculated to take into consideration the protection of the lender's "risk" capital as well as the protection of the New Jersey borrower, whose urgent financial need left him without any real bargaining power. Cf. Brookchester, Inc. v. Ligham, 17 N.J. 460 (1955).
Such being the legislative policy, assuming that defendants signed the closing statement with full knowledge of the contents and with full intention to be bound, the court cannot uphold the defense of estoppel.
The strong policy of the act may not be dissipated by the facts asserted to establish the estoppel. To hold otherwise would sanction the circumvention of the salutary benefits afforded by the law by means never contemplated by the statute which promulgated the policy.
Our Supreme Court, in dealing with a similar waiver of defenses clause in a sales contract, concluded that "the clause is an unfair imposition on a consumer goods purchaser and is contrary to public policy." Unico v. Owen, 50 N.J. 101, 123 (1967). The clause is equally contrary to the public policy which is applicable here.

EQUITABLE RELIEF SOUGHT BY BORROWER
As already observed, defendants were successful in securing the payment of $500 to them upon a complaint that National *39 Consumer Service, Inc. violated the act by taking this sum as a commission.
Defendants seek a judgment on their counterclaim directing plaintiff to cancel of record the second mortgage lien which was effected as a result of the loan.
Plaintiff's objection to this rests upon its claim that it would be inequitable to grant this relief, since, even assuming excessive charges and fees, defendants have received a total of $2,800  $2,300 at the time of the loan and $500 returned from National Consumer Discount, Inc. They had made four installment payments totalling $295.40.
The statutory remedy for violation of the provisions of the act is to render the obligation unenforceable. N.J.S.A. 17:11A-29. There is no provision for the cancellation of the mortgage, nor any provision for the repayment to the borrower of any payments already made or unlawful fees and commissions charged. Certainly this was a consequence which the legislation must have contemplated but deliberately failed to require.
Plaintiff argues that in seeking the equitable remedy of cancellation of the mortgage, defendants should do equity by at least repaying, without interest, the sum actually borrowed and received.
There is no doubt that the consequences to the lender of the violation of the act are drastic, although it should be noted that they are not as harsh as the penalty imposed by the Small Loan Law, N.J.S.A. 17:10-1 et seq., whereby the borrower is additionally "entitled to recover from the lender any sums paid or returned to the lender by the borrower on account of or in connection with the loan." N.J.S.A. 17:10-14.
The Secondary Mortgage Loan Act is penal as to the lender and remedial as to the borrower. Cf. Ryan v. Motor Credit Co. Inc., 130 N.J. Eq. 531, 541 (Ch. 1941), affirmed 132 N.J. Eq. 398 (E. & A. 1942). In the "run-of-the-mill" case arising under this act, barring any collusion as was present in Ryan, or other inequitable conduct, since *40 the note and mortgage are not enforceable the court will usually grant the request of the borrower to have the (now unenforceable) mortgage cancelled. However, the case before us presents one factor which takes it out of the "run-of-the-mill" category.
After defendants engaged counsel and found out that plaintiff could not, under the law, enforce payment of the note, they ceased making payments. Notwithstanding this knowledge, they sought and recovered $500 which had been deducted from the amount supposedly loaned to them. Since the law does not forbid repayment of the loan by the borrower, or allow the borrower to maintain an action for the return of his payments, as does the Small Loan Law, when defendants received the additional $500 it was presumably paid to them under the assumption and with the intention that they would now repay the loan according to the terms of the note.
Their action in accepting the $500 under these circumstances smacks of inequitable conduct and an attempt to penalize plaintiff, and at the same time to personally profit to a greater extent than contemplated by the legislative purpose. Defendants could only justify the taking of this $500 if they intended to repay the amount actually received by them.
Consequently, I will direct that the lien of the mortgage be cancelled of record only upon the repayment of $500 by defendants to plaintiff, together with interest from the date of the receipt by defendants of the $500 from National Consumer Discount, Inc.
I do not discuss any other contentions advanced by plaintiff since I do not find them of sufficient merit to warrant further discussion.
Accordingly, judgment will be entered dismissing the complaint and directing cancellation of the record of the mortgage upon the terms referred to.
NOTES
[*] Number 1 of "Rules and Regulations", adopted by the Department of Banking and Insurance, provides:

Notwithstanding the place of execution, nominal or real, of a secondary mortgage loan, if the real property is located in this State, said secondary mortgage loan will be deemed to be subject to The Secondary Mortgage Loan Act of 1965 and all other laws of the State of New Jersey.
Same has been disregarded by me because the effective date of said rules and regulations was December 27, 1965, five days after the date of the transaction involved in this case.