700 F.Supp. 1340 (1988)
COLDWELL BANKER COMMERCIAL REAL ESTATE SERVICES, A DIVISION OF COLDWELL BANKER COMMERCIAL GROUP, INC., a Delaware Corporation, Plaintiff,
v.
Richard D. WILSON; Justin A. Tokarski, Individually and t/a Justin Realty Co.; John G. Troast; Troast Enterprises, a New Jersey Limited Partnership; and Mahoney Troast Construction Corporation, a New Jersey corporation, Defendants.
Civ. A. No. 85-2307.
United States District Court, D. New Jersey.
May 20, 1988.
*1341 Lasser, Hochman, Marcus, Guryan & Kuskin, P.C., Roseland, N.J. by Sheppard A. Guryan, for plaintiff.
Uscher, Quiat, Russo & Uscher, P.C., Paramus, N.J. by Arthur Uscher, for defendant Wilson and Tokarski defendants.
Sills, Beck, Cummis, Zuckerman, Radin, Tischman & Epstein, P.C., Newark, N.J. by Jeffrey B. Cahn, for Troast defendants.

OPINION
BARRY, District Judge.
Plaintiff, Coldwell Banker Commercial Real Estate Services ("Coldwell Banker"), brings this action against defendants Richard D. Wilson and Justin A. Tokarski, individually and trading as Justin Realty Co., alleging breach of contract, fraud and misrepresentation.[1] On the eve of trial, defendants now move for summary judgment. For the reasons that follow, that motion will be denied in part and granted in part.
This dispute arises out of the development of what plaintiff describes as a "hotel/convention center/office building" located in the Meadowlands. On November 14, 1980, plaintiff secured an exclusive listing agreement with the owners of a 26 acre tract in East Rutherford referred to by the parties as the "Kero-Bosin Tract." Plaintiff, which had substantial and ongoing relationships with several hotel chains, expressed to the owners its belief that the site was suitable for hotel development. In fact, plaintiff had already shown the site to the Sheraton Corporation ("Sheraton") as early as September, 1980. It was apparently plaintiff's expertise that led the owners of the property, which was zoned for hotel use, to retain plaintiff rather than some other broker. In mid-February, 1981, after the property had been listed, plaintiff's representatives, Robert Singer and Ronald Sutherland, again presented the Kero-Bosin tract to Sheraton in the person of Charles DesLauriers. Correspondence from Singer further advised Mr. DesLauriers *1342 that efforts were ongoing to locate a developer for the project.[2]
On March 20, 1981, Singer spoke with Gene Preston from Troast Enterprises ("Troast"), a developer, and offered Troast the property. They spoke again about the property on April 2nd and 17th. Singer then spoke to defendant Richard Wilson, a principal in defendant Justin Realty, on April 30th who informed him that Troast was interested and that he, Wilson, represented the developer. Wilson and Singer, along with one of the owners of the property, Mr. Bosin, and his attorney, Mr. Friedman, met for lunch that day, and according to Singer, Wilson explained that he was a partner with Troast with experience developing Meadowlands property, and that Troast "would do nothing in the Meadowlands without consulting [me]." Affidavit of Robert Singer ¶ 6. Wilson then stated that he represented the Troast interests with reference to this deal, and asked for half the sales commission as co-broker if Troast purchased the property. Plaintiff, through Singer, agreed to split the fee "notwithstanding the fact that Coldwell Banker had already presented its package to Mr. Preston." Id. Wilson, Singer, Friedman and Bosin then met on or about May 4th with John Troast, a principal of Troast Enterprises. Troast expressed his interest in the property and agreed to make an offer. Singer states that Troast made an offer "on or about June 5, 1981" although there is no record proof of a written offer until Troast's letter of June 19, 1981 setting forth the terms and accompanied by a $5,000.00 check as a good faith deposit drawn on Justin Realty's trust account.
Around the same time, Singer contacted Wilson to inform him of plaintiff's efforts to interest a hotel chain in the property. Singer states that he told Wilson at the time that plaintiff would expect a fee of either one percent of the total project cost or $1,000.00 per room if any hotel chain introduced to Troast by plaintiff invested in the property. Wilson promised to speak to Troast.
On July 16, 1981, a meeting was held at plaintiff's offices. In attendance were John Troast, Preston, plaintiff's representatives Sutherland and Singer, three officials from Sheraton, and Wilson. Although no agreement was reached, Sheraton and Troast discussed the possibility of a joint venture. After the meeting, Sutherland, in Singer's presence, took Wilson and Troast aside and informed them that Coldwell Banker expected a fee if Sheraton and Troast agreed to a joint venture.
Throughout the summer Troast continued to engage in negotiations with Sheraton. Wilson kept plaintiff abreast of the talks although plaintiff's representatives were concerned over their exclusion from the meetings. Wilson is said by Singer to have allayed their fears by reiterating his promises to protect plaintiff's hotel fee by virtue of his equity interest in the project. On September 5, 1981, Bosin and his wife entered into a contract to sell the property to Troast. The agreement lists Coldwell Banker and Justin Realty as co-brokers. The parties seem to agree, that although facially binding on the parties, the agreement contained so many contingencies and was subject to certain practical difficulties such as zoning issues, it was just the first step in an arduous process.
In fact, the deal did not close until September 17, 1984. During the interim, Troast continued to negotiate with Sheraton as well as other interested hotel chains and Wilson continued to assure plaintiff that if Sheraton signed on its fee would be protected. By August of 1983, it became apparent that a deal between Troast and Sheraton was imminent. Wilson told Singer to send a letter to Troast outlining their understanding of the agreement on the hotel fee. Accordingly, Sutherland wrote Troast on September 6, 1983 informing it, for the first time in writing, of plaintiff's expectation of receiving a fee equal to one *1343 percent (1%) of the total cost of the proposed 450 room hotel.
Wilson, who had earlier sought part of the hotel fee, then wrote Singer on September 9, 1983, attaching a copy of the September 6th letter and setting out his understanding that, as with the land sales commission, Wilson would share in the hotel fee if the fee exceeded $200,000.00.
At this point the deal began to unravel. On October 19, 1983, Wilson called Singer to inform him that Troast did not believe that plaintiff had earned the hotel fee. Sutherland then met with principals of Troast who not only objected to the hotel fee but also informed him that Wilson had never represented Troast on any aspect of the deal. They further suggested that if plaintiff wanted the hotel fee it should pursue Wilson for it and withhold Wilson's half of the land sales commission.
Presumably plaintiff decided this was a good idea because Singer then contacted Friedman, who was preparing the documents for the closing, to arrange for the commission check to be paid only to Coldwell Banker. Singer informed him, Friedman says for the first time, of Coldwell Banker's claim to the hotel fee. Friedman objected to paying the sales commission only to plaintiff noting that the contract between Troast and the Bosins expressly named Justin Realty and Coldwell Banker as co-brokers. Friedman urged plaintiff to resolve its problems with Wilson so that the closing, which was fast approaching, would not be disrupted.
On January 31, 1984, Friedman informed Singer of a proposed closing date of March 1, 1984 and enclosed a copy of the proposed agreement. Again, Singer insisted on the whole commission and again Friedman refused to act in what he termed a mediating role between Wilson and plaintiff. Singer, getting nowhere with Friedman, tried to resolve the matter with Wilson. Wilson then agreed, in exchange for half the fee, to write Singer a letter setting forth Wilson's promise to "support any action taken by Coldwell Banker [against Troast] for their [hotel fee]," and to testify "that John Troast was told by me (in September 1981 and May/June of 1983) that a fee to Coldwell Banker would be due if he proceeded to consummate a partnership with the Sheraton Hotel chain." With Wilson's February 29, 1984 letter in hand, plaintiff agreed to share the sales commission.
What plaintiff did not know was that Wilson, too, could work both sides of a deal. Just two months earlier, Wilson had written a letter to John Troast in which, using carefully chosen words, he set forth his "understanding" that "to the best of my knowledge at the original meeting with the Sheraton [representatives] there were no discussions and certainly no agreement between you and Coldwell Banker concerning the payment of such commissions." On September 17, 1984, the Kero-Bosin tract was finally conveyed to a joint venture comprised of Troast, Sheraton and other smaller partners including an entity in which Wilson had a share. The sales commission was split equally between plaintiff and Justin Realty, $241,740.00 to each.
Without parsing out each count of the complaint and the precise legal theory relied upon, it appears that plaintiff's claim is essentially two-fold. Under plaintiff's first theory the defendants are liable for the hotel fee because Wilson's false representations regarding his relationship with Troast amounted to a breach of Wilson's implied warranty of authority. Under this theory, breach of the warranty would render Wilson liable on the contract. In the alternative, plaintiff alleges that Wilson's false representations induced plaintiff to share the sales commission, and now that it has been disclosed that Wilson did not represent Troast, defendants should be required to disgorge their half.
Defendants move for summary judgment contending: a) plaintiff cannot collect a fee earned in violation of state law; b) defendants, as agents of a disclosed principal, cannot be liable for that principal's contractual obligations; c) the contract for the hotel fee is vague and, therefore, unenforceable for lack of definite terms; d) the contract is not supported by consideration except past consideration; e) there is inadequate proof of fraud; and f) a guarantee *1344 by a third party must be in writing to be enforceable. I hold that plaintiff's collection of the hotel fee would violate New Jersey public policy and plaintiff, therefore, may not proceed on its contractual theory.[3] However, I also hold that plaintiff may proceed on its fraud theory at trial to attempt to recoup defendants' share of the land sales commission.
Defendants first contend that plaintiff may not receive any commissions based upon the joint venture because of a purported violation of its obligations as a fiduciary to the sellers of the property. I agree.
At common law a real estate broker was a fiduciary who owed to his principal the utmost duty of loyalty. This duty of loyalty includes a prohibition against self-dealing. Ellsworth Dobbs, Inc. v. Johnson, 50 N.J. 528, 553, 236 A.2d 843 (1967). This obligation, among others, is statutorily mandated as part and parcel of the broker licensing scheme set forth in N.J.S.A. 45:15-17(i). This licensing statute precludes a broker from:
Collecting a commission as a real estate broker in a transaction, when at the same time representing either party in a transaction in a different capacity for a consideration[.]
Id. Defendants argue that allowing plaintiff to succeed on its contract claim for the hotel fee would violate the public policy underlying the statute.
There can be no doubt that plaintiff in this case represented the seller in the sale of the Kero-Bosin tract. Plaintiff entered into an exclusive listing agreement with the sellers and received a sales commission when the tract was sold. Similarly, there is no question that plaintiff viewed itself as representing Troast in its dealings with Sheraton. The existence of this suit to collect a fee for that "representation" is convincing evidence of that fact. The only real dispute between the parties is whether or not Sheraton's deal with Troast to develop a hotel project and Troast's deal with the sellers of the land upon which the hotel was to be built amounted to separate transactions. This is significant because the plain language of the statute renders it applicable only to single transactions.
Unfortunately, only one reported decision construes the "in a transaction" language of N.J.S.A. 45:15-17(i) and that decision was reversed and remanded on other grounds for further development of the administrative record under circumstances that raise at least some question as to the precedential value of the lower court's decision. Mortgage Bankers Ass'n v. N.J. Real Estate Com'n, 200 N.J.Super. 584, 601, 491 A.2d 1317 (App.Div.1985), reversed and remanded on other grounds, 102 N.J. 176, 506 A.2d 733 (1986). However, I have carefully scrutinized both opinions and believe that much of the reasoning of the Appellate Division survived the Supreme Court's reversal and, importantly for present purposes, is not only persuasive but also instructive in resolving the issues now before the court.
Mortgage Bankers arose over a dispute as to whether real estate brokers could receive a fee from the seller of residential real estate and also receive a fee for obtaining mortgage financing for the buyer. The issue was joined when the First Boston Capital Group, Inc. ("First Boston") sought a declaratory ruling from the New Jersey Real Estate Commission that such an arrangement would not violate the conflict of interest provisions embodied in N.J.S.A. 45:15-17(i). First Boston sought the ruling in anticipation of a major investment in a program that allowed brokers to organize their own mortgage origination companies. First Boston's efforts were vigorously opposed by a trade association of New Jersey mortgage bankers who saw any such arrangement as a conflict of interest.
The Commission ultimately ruled that it: shall not consider it a violation of N.J.S. A. 45:15-17(i) when a duly licensed real estate broker receives fees for services rendered in more than one capacity in a single transaction.
Mortgage Bankers, 102 N.J. at 180, 506 A.2d 733. The Commission's ruling was *1345 premised on the conclusion that allowing the First Boston marketing plan would increase the availability of mortgage money at a time when high interest rates had made it difficult to obtain financing. The Commission further concluded that N.J.S. A. 45:15-17(i) did not apply because:
When a broker receives compensation for assisting in the placement of a mortgage, the compensation is paid by the mortgage originator, not the buyer. Thus, by receiving compensation for such services, the broker is not being paid for "representing" the buyer.
Mortgage Bankers, 102 N.J. at 186, 506 A.2d 733. Despite the Commission's ruling that N.J.S.A. 45:15-17(i) did not apply, in the letter transmitting its decision to First Boston the Commission suggested, nonetheless, that brokers placing mortgages "disclose the broker's role and compensation in the mortgage transaction and make such disclosure to the other parties to the transaction." Mortgage Bankers, 200 N.J. Super. at 599, 491 A.2d 1317.
As to all significant matters, the Appellate Division reversed. The court began by rejecting the Commission's conclusion that the statute did not apply. First, the court noted that the Commission did not have the authority to ignore the plain wording of the statute merely because it determined that the mortgage industry needed a shot in the arm. Nor did the Commission have the authority to read a disclosure exception into the statute. The court noted that the legislature had considered, and rejected, an earlier version of the statute that would have allowed a broker "dual compensation upon `full disclosure in writing[]'" to the affected parties. Id. at 600, 491 A.2d 1317.
Having determined that the statute applied in a general sense, the court then examined the two main components of the statute, namely, a) whether it could be said that the broker "represented" both the buyer and seller, and b) whether or not the sale and mortgage were part of the same transaction. Taking the latter issue first, the Appellate Division held that "the two transactions are so closely entwined, so interdependent and have so great a potential for conflict of interest and self-dealing on the part of the broker as to require the conclusion that at least for purposes of this statute they are each a part of the single, overall transaction." Id. at 601, 491 A.2d 1317.
Earlier in the opinion, the court had explained that the mortgage was an essential element of the sale and that each party had an interest in seeing that the buyer obtained one. However, this situation was easily exploited. Id. at 593, 491 A.2d 1317. The buyer could reasonably expect that the broker would work on his behalf. The broker, on the other hand, would be interested in placing the loan where he could expect a fee even if that were not the best deal for the buyer and even if the loan arrangement required the seller to finance the points. The broker's shifting obligations, in which he or she was "sorely tempted and highly motivated to serve his own self-interest to the disadvantage of his principals[]" could easily "unduly delay or complicate the title closing." Id. at 594, 491 A.2d 1317.
As for the issue of representation, the Appellate Division rejected the Commission's conclusion that the lender and not the buyer paid the fee as "contrary to economic reality." The fee, the court reasoned, was too easily passed on to the mortgagor. Id. at 604, 491 A.2d 1317.
The New Jersey Supreme Court reversed and remanded. Although the decision of the court is less than clear, the following can be safely culled from that decision. The Supreme Court was plainly disturbed that the issues addressed by the Commission evolved from an enormously sloppy and unfocused administrative process. Mortgage Bankers, 102 N.J. at 181, 184-85, 506 A.2d 733. Thus, the primary purpose of the reversal and remand, with regard to the issue of N.J.S.A. 45:15-17(i), was not only to develop a more complete factual record but also to insure the input of Department of Banking which was charged with regulating mortgage bankers but which had been excluded from the adjudicatory process. Id. at 192, 506 A.2d 733.
*1346 However, certain aspects of the Appellate Division's holdings remained undisturbed. First, although the Court strongly suggested that on remand the Commission and Department of Banking look closely at the possibility that disclosure might clarify "the real estate broker's relationship to the buyer," with regard to the issue of representation, nothing in the Court's opinion suggests that the Appellate Division's construction of the statute regarding disclosure is incorrect when no issue of representation exists, as in the instant case. Moreover, no issue is taken with the lower court's functional analysis of the term "transaction." Applying the Appellate Division's discussion of "disclosure" and "transaction" to the instant case, it is clear that plaintiff's contract claim is barred by the statute.
Turning first to the issue of "disclosure," plaintiff argues that whatever conflict of interest occurred prior to December, 1983 was cured when Singer called Friedman and explained his difficulties in securing Troast's promise to pay the hotel fee. This position is untenable. First, the plain wording of the statute hints of no disclosure exception. See Caminetti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917) ("[w]here the language is plain and admits of no more than one meaning the duty of interpretation does not arise"). The statute simply precludes collecting compensation from both sides of a transaction. Implying a disclosure exception would be an unwarranted and activistic extension of the legislature's intent. Moreover, the Appellate Division makes clear, and nothing in the Supreme Court's decision clouds this issue, that the legislative history of N.J.S.A. 45:15-17(i) strongly supports the conclusion that the legislature rejected a disclosure exception. I, therefore, decline to accept plaintiff's invitation to engraft such an exception onto the statute and find that Singer's disclosure to Friedman does not preclude defendants from arguing the bar of N.J.S.A. 45:15-17(i).
The second aspect of the Appellate Division's opinion left undisturbed is its utilitarian definition of "single transaction." Under this definition, two seemingly distinct transactions are considered one when they are "closely entwined, so interdependent and have so great a potential for conflict of interest and self-dealing...." Mortgage Bankers, 200 N.J.Super. at 601, 491 A.2d 1317. The case at bar, which has both two integrated transactions and uncontroverted evidence of self-dealing, clearly meets this definitional test.
Turning first to the issue of interrelatedness, plaintiff argues strenuously that the deal between Troast and the Bosins in September, 1981 was distinct from the later deal between Troast and Sheraton. Plaintiff attempts to paint a picture in which the first transaction was a completed and unrelated transaction. Under this scenario, plaintiff had secured a buyer and thus had fulfilled its obligations to the listing party and was thereafter free to work on behalf of the contractually bound buyer to secure a development partner. However, plaintiff's own recitation of the facts belies this contention.
First, it is uncontroverted that plaintiff's first "client" was Sheraton. Before plaintiff had even listed the Kero-Bosin project, it had introduced Sheraton to the tract as one of the area's parcels fit for hotel development. Clearly, plaintiff considered the need to attract a hotel to the site to be an important element in selling the property. Second, plaintiff induced the owners of the tract to sign the listing agreement on the express representation that the site was highly attractive as a hotel. Third, as a experienced broker, plaintiff knew that in order to develop the site for a hotel chain, which typically did not take equity positions, a developer/owner was needed as well. Fourth, plaintiff's argument would be more persuasive if the Bosin/Troast agreement had been the contract that closed and the contract from which plaintiff's land sales commission ultimately derived. However, the facts clearly show that the Bosin/Troast agreement was superceded by the agreement transferring the tract to the joint venture, thus underscoring the importance of, even the need for, the hotel chain. In sum, plaintiff had *1347 to know before hand what ultimately came to pass: only a triparte deal between the seller and the joint buyers would insure development of the property. Just as the residential buyer needs the mortgage, and often all the help he can get in finding it, plaintiff had to know that the deal for the Kero-Bosin tract was as dependent on Troast finding a Sheraton as it was on Sheraton finding a Troast.
Not only were the two transactions interrelated in significant, even determinative ways, they also spawned the conflict of interest and self-dealing anticipated by the Appellate Division. That Court opined that whenever a broker placed itself between the seller and the buyer its efforts could serve neither party, or worse, harm one of the two. Both of those hypotheticals occurred in this case. First of all, although somewhat buried in Friedman's affidavit, plaintiff simply makes no effort to rebut his assertion that the sellers paid plaintiff over $18,000.00 for a study on the feasibility of hotel development, information plaintiff then used in its efforts to work a deal between Troast and Sheraton. Would any reasonable businessman, acting as principal, pay his agent such a sum for a study that the agent would then use to generate a fee of almost one half of a million dollars from the principal's contractual adversary? The answer to the question is self-evident. Clearly, the role of master and servant has been reversed.
Second, just as the Appellate Division predicted, an agent serving two principals might, in order to serve his own interests, "delay or complicate the title closing." Here, the correspondence between Friedman and Singer makes clear that Singer saw nothing wrong in interjecting his dispute with Troast over the hotel fee into the closing process. Although Singer is quick to criticize Friedman for not raising the conflict issue, Friedman at least, if not Singer, had his client's interests in mind when he warned Singer to refrain from conduct that could have jeopardized the closing.
Here, the uncontroverted facts demonstrate that plaintiff impermissibly sought to extract compensation from parties on opposite sides of a single, unitary transaction in clear violation of N.J.S.A. 45:15-17(i). The only remaining question is the appropriate penalty.
Defendants argue that plaintiff should be precluded from collecting any portion of the hotel fee. I agree. The law of New Jersey is clear that a broker who violates N.J.S.A. 45:15-17(i) may not collect his commission earned in violation of the statute. Winding Brook Realty v. Platzer, 166 N.J.Super. 575, 400 A.2d 145 (Law Div. 1979), aff'd 173 N.J.Super. 472, 414 A.2d 596 (App.Div.1980). This result is consistent with fundamental principals of contract law. Plaintiff's breach of an implied warranty of authority is clearly a contractual claim. A person who purports to bind another in contract, whom he has no power to bind, is personally liable to the other contracting party. Bregman Screen & Lumber Co. v. Bechefsky, 16 N.J.Super. 35, 39, 83 A.2d 804 (App.Div.1951). Here, plaintiff has offered to prove that Wilson was never Troast's agent and hence that Wilson and the other defendants are liable in contract for Wilson's misrepresentation to the contrary. Id. However, a contract that violates public policy is void. HIMC Inv. Co. v. Siciliano, 103 N.J.Super. 27, 246 A.2d 502 (Law Div.1968). More specifically, a contract formed in violation of a statute is void as against public policy. Naseef v. Cord, Inc. 90 N.J.Super. 135, 216 A.2d 413 (App.Div.), aff'd on other grounds, 48 N.J. 317, 225 A.2d 343 (1966).
I reject plaintiff's assertion that defendants' own participation in the proposed transaction estops them from raising the statute as a defense. Plaintiff cites no case for this proposition and New Jersey law is clearly to the contrary. The doctrine of estoppel cannot be invoked to enforce an agreement in violation of public policy. McCarthy v. National Ass'n for Stock Car Auto Racing, Inc., 90 N.J.Super. 574, 218 A.2d 871 (App.Div.1966), aff'd, 48 N.J. 539, 226 A.2d 713 (1967). If the rule were otherwise, illegal contracts would be void only if challenged by third parties whose standing would surely be questioned. Accordingly, *1348 because defendants have demonstrated that there can be but one reasonable conclusion as to the verdict on those claims, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), I will grant defendants' motion for summary judgment on the two counts in the four count complaint that sound in contract, and on the one count of the complaint sounding in fraud which seeks recovery of the hotel fee.
Defendants argue that plaintiff's transgressions with regard to N.J.S.A. 45:15-17(i) should also bar its claim to recover defendants' half of the land sales commission. At first blush, this argument has appeal. Ordinarily, the court will not assist either party to an illegal contract and will leave the parties as it found them. Design-4 v. Masen Moutainside Inn, Inc., 148 N.J.Super. 290, 372 A.2d 640 (App.Div. 1977). Here, however, that somewhat trite rule would work an inequitable result. Despite defendants' unsupported assertions to the contrary, plaintiff has set forth sufficient evidence from which a reasonable jury could conclude that defendants are liable to plaintiff for half the sales commission based upon a theory of fraud.
Plaintiff has set forth sufficient evidence in the record that if believed by a jury would support a finding that Wilson told Singer that he had the authority to promise that Troast would pay the hotel fee, that this statement was knowingly false when made, and that in reliance on that misrepresentation plaintiff shared the sales commission with defendants who were not otherwise entitled to it. This court will not allow what appears to be in all significant respects a classic case of fraud fall by the wayside merely because plaintiff overstepped its bounds in relation to the sellers. While the court obviously does not condone plaintiff's disregard for its ethical obligations as embodied in N.J.S.A. 45:15-17(i), to hold otherwise would confer upon defendants a windfall, a result this court will not countenance. Accordingly, plaintiff may proceed to trial on the one count of its complaint sounding in fraud and misrepresentation that seeks to recover one-half of the sales commission. One of plaintiff's intentional tort claims having survived summary judgment, it may also seek punitive damages.
The court will enter an appropriate order.

ORDER
This matter having been opened to the court by defendants' motion for summary judgment, and plaintiff having filed opposition thereto, and the court having considered the submissions of the parties, without oral argument, pursuant to Fed.R. Civ.Pr. 78; and
The court having rendered an opinion on the date hereof, and for the reasons expressed therein,
It is on this 20th day of May, 1988
ORDERED that defendants' motion for summary judgment on Counts 1, 3, and 4 of the Complaint be and the same hereby is granted; and it is further
ORDERED that defendants' motion for summary judgment on Count 2 the Complaint be and the same hereby is denied.
NOTES
[1] Also named in the original complaint were John G. Troast, Troast Enterprises, and Mahoney Troast Construction Corporation. These defendants have been settled out of the case.
[2] According to plaintiff it is uncommon for a large chain such as Sheraton to take an equity position in a new hotel. Rather, the project is developed and owned by others who lease the property for operation as a hotel.
[3] Because of this disposition, I need not address defendants' other contractual defenses.